Nott, J.,
delivered the opinion of the court:
He who obtains a judgment in a court of law acquires property; which may be bought and sold; which the law regards as the highest evidence of debt; and which cannot be taken away from him through evidence newly discovered, unless the motion be in furtherance of justice and the evidence appear as conclusive as that through which the judgment was obtained. The granting of a new trial on newly-discovered evidence is, in one sense, discretionary with the court that awarded the judgment, for it is not the subject of judicial review. But to guard against the suspicions and prejudices of judges seizing upon trivial pretexts for the setting aside of judgments; to prevent the exercise of this irresponsible judicial power from degenerating into judicial abuse; to exact from litigants good faith and full endeavor when passing through the ordeal of a trial; and to carry into effect a salutary principle of public policy, that there must be an end of litigation even though injustice to individuals be done, all courts of the common law have united in restricting this administration of justice within a certain, clear, fixed, and unvarying rule. And in no place has this exceptional power to destroy the finality'of judgments been more clearly restricted or more guardedly exercised than in the Federal courts.
The legal principles which govern the granting of new trials nn newly-discovered evidence are neither new, unsettled, nor ■obscure. None are more clearly defined, more' certainly established, or more familiar to the lawyer’s mind. In the language of a standard text-book, “ To obtain a new trial on this ground, certain well-defined prerequisites are indispensable. *307 The conditions, indeed, are so clear and well settled that courts scarcely ever need to doubt or hesitate as to their application. They are founded on solid reasons of utility as well as justice, and are so simple as to be easily understood and remembered by the practitioner. They are to be found differently stated in the books of reports — the same always in substance.” — (Graham & Waterman, 3,1021.)
The law of new trials in this court was supposed to have been settled by the decision of all the judges in the cases of Child, Pratt & Pox, (6 O. Cls. R., p. 44,) and Beeson, (id., p. 227;) yet since this motion has been made, notwithstanding those decisions, it may be advisable to restate briefly the law that is understood to prevail.
The Court of Claims Act, (10 Stat. L., p. 612, § 9,) establishing this court, also established as the law of new trials therein the (crules” which at “ common law or chancery in suits between individuals would furnish sufficient ground for granting a new trial;” a provision of which this court saicl, at the last term, in the opinion read by the Chief Justice and concurred in by all the judges, tc We consider that this section applies to cases in this■ court under its present organization, as well as under its original constitution under that act; and preeludes our granting a neio trial to claimants in any case where, by the rules of common law or chancery, it Mould not be granted.” — (Beeson’s Case.)
By the Amended Court of Claims Act, (12 Stat. L., p. 765, § 7,) reconstituting this court, it was provided that “ any final judgment rendered against the claimant on any claim prosecuted 'as aforesaid shall forever bar any further claim or demand against the United States arising out of the matters involved in the controversy a provision which we have held was - not u intended to do more than attach to the final judgments of this court the eonclusiveness ivhich the common law ascribes to the final judgments of all courts of competent jurisdiction.” — (Spicer'1 s Case, 4 C. Cls. R., p. 34.)
In 1867 this court recognized as the law of the court the well-established common-law “ rule by which the granting of neio trials is regulated,” and held the -moving party to the • strictest diligence, (Garrison’s Case, 2 C. Cls. R., p. 389 5) a decision which all the judges subsequently held to apply as well to the Government as to the individual, and of which as against the Government it was said, “ We adhere to the rule we have heretofore *308 laid down, that a new trial toill not he granted where, by the use of due diligence, the evidence relied upon as a ground therefor might ha/oe been discovered in time to be produced at the trialP — (Per Drake, Gh. J., Child, Pratt cfc Pox Case, 6 0. Gis. R., p. 49.)
Snob being the law as established by statute and declared by this court in 1867, it could only be changed by the reversal of the Supreme Court or the enactment of Congress. It was, of course, within the power of Congress to sweep away the 'common-law rule entirely, or to change it; and in 1868 Congress did enact an alteration. The common-law rule is too well known and too certainly fixed to need investigation, being almost universally enunciated in the same terms by the English, Federal, and State courts. It is enough to say that it imposes on the moving party these conditions:
1. “ That tiie evidence has come to his knowledge since the trial.
2. u That it was not owing to the want of due diligence that it did not come sooner.
3. “ That it is so material that it would probably produce a different verdict if the new trial were granted.
4. “ That it is not cumulative.
5. To which is added, “ a new trial will not be granted if the only object of the newly-discovered evidence is to impeach the character or credit of a witness.” — (3 Graham & Waterman, p. 1021.)
The Act 25th June, 1868, (15 Stat. L., p. 75, § 2,) provides u That said Court of Claims, at any time while any stdt or claim is pending before, or on appeal from, said court, or within two years next after the final disposition of my suit or claim, may, on-motion on behalf of the United States, grant a new trial in any such suit or claim and stay the payment of any judgment therein, upon such evidence (although the smie may be cumulative -or other) as shall reasonably satisfy said court that any fraud, wrong, or injustice in the premises has been doné to the United States.” •By this the act. modifies the rule of the common law, and. abrogates some of its conditions:
1st. It gives to one party an advantage not common to the other.
2d. It enlarges the time within which a motion may be made by the favored party, and lest the maxim, nullum tempus oceurit *309 ■regi, should be strained to make tbe time interminable, the act reduces it to a fixed period.
3d. It allows the motion to be made on behalf of the favored party, even though this court has lost jurisdiction of tbe action— a provision which the Supreme Court has characterized as an anomaly, but to which it has-given effect. — (.Ayers's Case, 9 Wall., p. 608.)
4th. It authorizes the motion to be founded upon evidence which “ may be cumulative,” an alteration which clearly refers to the rule of the common law, and recognizes and affirms — if recognition and affirmation be necessary — the existence of that ¡rule in the practice of this court.
Therefore, as to those particulars which were not by Congress abrogated, the rule received from Congress a legislative sanction. Congress, by enacting an exception to the rule, confirmed the rule. ¡Exeeptio probat regulam.
Finally, the act of 1868 has already received a judicial construction eminently applicable to. this case. In general terms, decisive, unambiguous, unmistakable, the Chief Justice said, and all the judges of the court concurred, “ The simple design of this section, as it appears to us, is to protect the Government against unconscionable advantages gained over it, without laches or mistake on the part of its officers; not to give it unconscionable advantages over claimants through such laches or mistake.” — (Child, Pratt & Fox Case, 6 C. Ols. It., p. 52.) And of this decision the leading counsel of the Government, on a similar motion in another case, has said that “no man-could quarrel with it;n and of the statute, that “ most assuredly it does nothing but change the common lato in two particulars, the time toithin which the motion may be made and the cumulative■ evidence on which it may be foundedP ■ ■
Therefore it is not open to-inquiry in this court whether the Government, like other suitors, is or is not bound to due diligence.
But it has not been definitively settled on what officers of the Government the obligation of diligence falls. “The United States ” appear as parties in courts, but tbe State is not an entity ; the Government is not a person. What are the United States, considered as defendants at law ? Who is the Government when it comes into a court-of justice?
Manifestly, all the citizens of the United States are not *310 ■chargeable with the knowledge and duties of defendants in this suit. Manifestly, neither knowledge nor duty can be imputed to all the officers of the Government. Where, then, shall the weight of this obligation rest, when it would rest upon an ordinary litigant ?
We answer the inquiry by the enunciation of what appears to be the only just and appropriate rule: In suits where the Government is. a party plaintiff or defendant, those of its officers whom the law makes officially cognizant of the suit, or who are charged in law or in fact with its prosecution or defense, must be deemed to stand in the stead of the ordinary party so far as mere legal proceedings are involved, and be subject to his obligations of care and diligence. These officers are indicated and this official cognizance is established, so far as this court is concerned, by the same statute which authorizes the Government to seek a new trial on terms and conditions less strict than those which bind the opposing party. Act 26th'June, 1868, (15 Stat. L., p. 75, § 6.) First, it is made the duty of the “Attorney General and his assistants, in all cases brought against the United States in said Court of Claims, founded upon any- contract, agreement, or transaction with any Executive Department, or any Bureau, officer, or agent of such Department, or where the matter or thing on which the claim is based shall have been passed upon and decided by any Department, Bureau, or officer intrusted by law or Department regulations with the settlement and adjustment of such claims, demands, or accounts, to transmit to said Department, Bureau, or officer, as aforesaid, a printed copy of the petition filed by the claimant in such case, with a request that the-said Department, Bureau, or officer to whom the same shall be so transmitted as aforesaid, will furnish to said Attorney-General all facts, circumstances, and evidence touching-said claim as is or may be in the possession or knowledge of the said Department, Bureau, or officers.'’ Second, it is made the duty of the “Department, Bureau, or officer to whom such petition maybe transmitted and such request preferred as aforesaid, without delay and within a reasonable time, to furnish said Attorney-General with a full statement of all the facts, information, and proofs which are or may be within the Icnowledge or in the possession of said Department, Bureau, or officer, relating to the claim aforesaid. Such statement shall also contain a reference to or description of all official documents or papers, if any, as may or do *311 furnish proof of facts referral to in said, statement, or that may he necessary and proper for the defenseP These provisions of the statute, and the proceeding under them, connect these officers, to a certain extent, as directly and decisively with the defense of a suit against the United States in this court as is the Attorney-G-eneral himself. And it is as much their responsibility as it would be his, if the defense for lack of diligence on their part failed, and their neglect, like his, would be the misfortune of the Government, and a.s fatal.
This requirement of diligence may appear, though a necessity, prejudicial to the interests of the Government. On the contrary, like all just requirements, it will redound to the welfare of the Government. And there could not be devised a more pernicious basis whereon rogues and sharpers might build up a business of suppressing evidence and black-mailing suitors than a doctrine that new trials may be allowed for the negligence or mistakes of these public officers. Under the rule that exacts diligence and maintains the duality of judgments, a subordinate clerk assigned to the work of searching for documents in the defense, may chance to stumble on an important paper, as a receipt or release. Occasionally, it is true, a fraudulent claimant may be at his elbow; but ordinarily he will have no time to find and treat -with a distant suitor; nor will one suitor in a hundred dare to put himself in the power of a stranger, nor care to risk any large sum in procuring the suppression of the paper. Under an opposite rule such a clerk, as a mere venture, would omit the paper from the record which he makes up. Watching the progress of the suit, and waiting till the claim should acquire the new value of a judgment, he would approach the party and threaten him with the .pains and penalties of a new trial and the loss of the property which it was supposed the judgment represented and assured. Men who would not advance anything toward attaining,a judgment future and remote, would pay roundly to retain one actually recovered. If the evidence were really important, the clerk might name his own terms. Failing to ñud a customer in this party, he would then, through an accomplice, try to find a customer in the other. The accomplice would approach some not too scrupulous officer of the Treasury, and, with sufficient assurances of fraud and wrong perpetrated by the claimant, make a “ contract,” as it .might be termed, for the production of evidence which should *312 secure to the Government a new trial. Then the suppressed evidence would be discovered, and somenew Assistant Attorney-General would make affidavit that it was, as he believed, newly discovered, and a weak' and erring court would hold the affidavit and the document sufficient to overturn a judgment at law; and eventually honest suitors and honorable counsel would discover that the court was a tribunal that afforded them little else than boundless vexation and interminable delay.
When we come to the facts on which this motion is made, we find that the defendants have not complied with -one single condition of the law, (save the time within which such motions may be made,) nor presented a reason for a new trial entitled to consideration.
1. The moving affidavit is made by an assistant counsel of the Attorney-General, retained in the case long subsequent to the former trial, and in no way connected with the former defense. The affidavit implies nothing more than that the new evidence has come to the knowledge of this counsel sídcb the former trial, but when, how, or amid what circumstances it was discovered does not appear as is required by the law. (Palmer v. Fisk, 2 Curtis, C. Cls. R., p. 14.) The affidavit establishes nothing more than that a lawyer having nothing to do with a case on its trial, then knew nothing about the evidence relating; to it, (which is an ignorance probably shared by every lawyer in the world except the few employed on the trial or in some way connected with the case;) and that this lawyer has found some evidence which, for some reason or other unknown to> him, was not produced when the case was tried.
3. Neither the vigilance nor diligence of the former law-officers of the Government, previously charged with tbe defense of the action, is shown; nor can the testimony now sought to> be introduced be regarded as newly-discovered evidence. On the contrary, it appears that the witness now sought to be examined, Captain Hade, had been the defendants’ own officer and agent, and specially charged with the care and custody of captured cotton at Atlanta; being, of all witnesses in the world, the one that they were most bound to call, or, at least, confer with. Furthermore, it appears that there was another suit, then pending, brought by one Julius Hayden, likewise relating-to the Atlanta cotton, and, like this, seeking the proceeds of cotton which had not been receipted for, wherein this same *313 Captain Hade was a witness. These two suits ran side by side with remarkable uniformity. Thus we find, on the 13th of January, 1868, notice was given to the solicitor of the Court of Claims that Captain Hade would be examined as a witness; on the 29th came the first trial in this suit. On the 3d of February, 1868, Captain Hade’s testimony was taken, the defendants appearing by counsel and cross-examining; on the 8th of June following this case was submitted on its second trial. On the 27th of January, 1869, the case of Hayden was tried, and the testimony of Captain Hade read and commented upon; on the 10th March following, this case was brought to its third and last trial. Thus, three times were the defendants directly notified of the existence of Captain Hade, of his residence, and ability to testify; and, most singularly, were they thus notified just before each of the three trials in the case. At the first trial the defendants were represented by the solicitor of the court and his assistants; at the last trial by counsel specially retained by the Treasury Department to defend the eaptured-property cases. The existence and residence of Captain Hade must have been known to all of these gentlémen, and all must have concurred in deeming him a needless or a dangerous witness. The casé is therefore precisely like that of Child, Pratt & Fox. There, the defendants’ counsel had in liis possession a document which he knew of, but did not put in evidence; here, he had within the jurisdiction of the court a witness, of whose connection with the case and residence he was likewise acquainted, but whom he did not see fit to examine. The special counsel of the Treasury was a lawyer, not only distinguished in general practice for learning and ability, but eminent at this bar for the earnestness, ingenuity, and ceaseless vigilance with which he maintained the interests of his clients, the defendants, and brought everything of fact or of law to the trial which could sustain their side of the case. Moreover, that counsel now represents the Government before one of the international commissions, .and he has actually appeared before this court at the present term as counsel for the defendants in other cases, yet his affidavit is not produced to show mistake, or ignorance, or to excuse in any way the non-production of this evidence at the proper time. The motion rests exclusively upon the affidavit of counsel, who knew nothing about the case when it was tried, and who still knows *314 nothing about the knowledge and. views of his predecessors when they tried it. It is not newly-discovered evidence which supports the motion, but an excuse for a new trial, which appeals only to the suspicions of the court. Courts cannot grant new trials upon suspicion, nor are they invested with an immeasurable ' discretion that will enable them to destroy the finality of judgments on their mere pleasure.
3. The newly-discovered evidence, as it called, is irrelevant and immaterial, and would in nowise affect the result. The claimant did not allege any specific time or place of seizure, but generally that uabout the 10th day of September, 1864, after the occupation of said city by the'United States forces, all of the said cotton ivas seized and tahen possession of by the military forces,” and a was turned over by the officers seizing it to an agent of the Treasury Department, by whom it was sold.” In thus pleading the implied capture as of the time of the capture of the country in which the property was, the claimant proceeded in accordance with the decisions of this court and the uniform practice of the bar. On the first trial it did not appear that the cotton had come to the official custody of any military officer, and the court remanded the case for what was taken to be a defect of proof. On the last trial certain other facts were established. It was shown that almost immediately after the capture of Atlanta this claimant applied for and procured a pass to bring in his cotton from the surrounding country; that the cotton was brought in and placed in a warehouse under military surveillance ; that all the cotton in Atlanta was swept up by the military and shipped northward before the destruction of the city; that this cotton, identified by name and mark, came to the possession of a Treasury agent, and was sold at public sale in Cincinnati. On these facts the judgment of the court rested. It had been claimed by the defendants, and conceded by the claimant, that the captured cotton never came to the official custody of Captain Hade; but the court found that its proceeds had reached the Treasury through another channel. None of these conclusions is touched by the newly-discovered evidence. All that it can do will be to controvert certain proof as to the particular train on which the cotton left the city, and to overthrow a certain excuse volunteered by the claimant’s witnesses as to why he had not procured a receipt from Captain Hade for cotton which had never come to Captain Hade’s *315 custody. The evidence is clearly irrelevant, like that which it seeks to contradict, and all of it would be stricken out of the record if properly objected to on-the trial.
4. The only effect of the newly-discovered evidence, if it were admitted, would be to contradict two of the claimant’s witnesses, and, as was insisted on the argument, to convict them, before this court, of perjury. .But the defendants have laid no foundation for doing any such thing. - The witnesses, on their direct examination, speak of Captain Hade as having “ gone,” as having “left the city,” when the cotton was delivered at the State depot,-and the defendants did not cross-examine upon that point. The testimony, therefore,- is of a kind which, though positive in terms, is always understood to be matter of report, belief, or reputation. When a witness testifies that a man is dead vrho is in fact alive, or that a man is in France who is in fact in Germany, no intentional falsehood is necessarily to be inferred. On the contrary, the. party seeking to impeach must bring the witness - down to specific facts-within his own knowledge — to time, place, and circumstances; a foundation which the defendants have wholly neglected to lay. But, if they had laid such a foundation, this evidence would not now avail them anything. UA new trial will not be granted ” “ to contradict a witness as to a fact of no considerable importance by negative evidence given nearly ten years after the event testified to ; nor to impeach a witness or disprove a statement which, did not materially affect the legal aspect of the case.'1' Oarr v.-Gale, (1 Curtis C. Ot. B.., p. 384.) And two of thé ablest of American judges (Curtis and Ware, J. J.,) have said, in a case remarkably like this, (id.:) uWe could not grant a neio trial' merely on account of the,contradiction of a witness, otherwise credible, upon a circumstance of .very slight importance in the cause, and! especially when that contradiction is by affidavits talcen in his absence.”
There are also two reasons urged for a new trial falling outside of the ordinary scope and. -effect of newly-discovered evidence, and which may be designated as grounds unknown to established law. The first of these is that this court has spread upon the record of the appeal as a fact that the reason why the claimant did not procure a receipt for his cotton from Captain Hade was because Captain Hade had left Atlanta, whereas the newly-discovered evidence shows conclusively that he had not. That finding was not volunteered by this court. *316 After the case bad reached the Supreme Court (where it is still pending) an order was made by that court directing us to certify up the fact, and we thereupon returned the substance of the irrelevant testimony as the only appropriate response. That a fact which is irrelevant and immaterial will become relevant and material by being spread upon the records of an appellate court; or that a party may ask that a judgment against him be set aside, and the costs, delay, and harassment of a pending appeal be thrown upon his opponent because evidence has gone up as to which he, the moving party, never objected, cross-examined, or contradicted, are extraordinary propositions. New trials are notgranted, judgments are not vacated, litigation is not made perpetual, that a heedless and negligent party may modify and improve the record of his own appeal. The judges of this court have no power to take away a man’s property in a judgment except in those cases established by law. But it appeared, also, on the hearing that the irrelevant matter did not go up on the Supreme Court’s own motion after an examination of the original record, but did go up by the express consent of the same moving party, through a former Assistant Attorney-General. This court, therefore, is left freed from all responsibility as to its effect, and without apology should it attempt by indirect means to covertly withdraw it from the consideration of the appellate court.
Finally, a recent report from the Treasury Department relating to Atlanta cotton has been pressed upon us as a sufficient ground for granting a new trial, the object being to show that the proceeds of this particular cotton (sold by a Treasury agent at Cincinnati) are not, in fact, in the Treasury. The Supreme Court has held that the Government is but a trustee of this captured property, holding it for the benefit of its loyal owners. These reports of the Treasury, therefore, are little more in effect than the reports of a receiver as to the condition of assets within his hands. They are not conclusive upon a claimant, and he is at liberty to attack and supplement them. When they show his proceeds in the Treasury they are conclusive for him; when they are silent he may establish otherwise his interest in the captured-property fund. Unfortunately, they have not been found to be entitled to implicit reliance, and none has proved to be complete, much less conclusive. For example, the first of these Atlanta cotton reports showed the *317 capture of twenty bales, and' no more; tbe fourth, of four hundred and sixty-seven. This fifth report now produced may vary from the others, but how do we know that there will not be a subsequent report which will show additional captures ?
The record of this case discloses that shortly before the capture of Atlanta a loyal citizen residing there, instead of sending his cotton to a southern market, or turning it over to the Confederate government, or removing it from beyond the possibilities of capture by the Union armies, on the contrary, secreted it by night to await their coming. Almost immediately after the occupation of Atlanta, this citizen went and reported his cotton hidden in the surrounding woods to this same Captain Hade, and procured from him an order to go beyond the lines and bring it in and deliver it up to the Government. He did this before there were detectives to find -it, or speculators to buy it; and he asked no present remuneration, but gave it up freely, trusting to the honor of his Government to ultimately refund to him its proceeds. After the war he brought his action — the only remedy that the law gave. The case was tried and retried, 'and again tried, before a final judgment was obtained, and then the claimant recovered neither costs nor interest, (for the law gives neither,) although the Government had used and invested his money and enjoyed an actual benefit theréfrom. But the. defendants appealed and payment of the judgment was stayed thereby. At the last term of the Supreme Court the case was reached on its docket, as we are informed, and then, after all the delays, harassments, and expenses of the litigation, it was continued for the term and thrown over another year in order that this motion, which we now find to be frivolous, might be heard here. Such a record cannot receive the approval of the nation, nor of Congress, nor of the law-officers of the Government. There must be an end of litigation; and legal justice, if it cannot be certain, may at least be prompt.
The order of the court is that the motion for a new trial be denied.