Davis, J.,
delivered tbe opinion of tbe court:
This action is brought to recover damages for alleged breaches of two contracts, each for the construction of a part of the breakwater of the Harbor of Eefuge at Sand Beach, in Michigan, on Lake Huron.
The case was ably and fully argued. The court has also had the advantage of subsequent written briefs and arguments on both sides, and we now feel entire confidence in the correctness of the results which we have reached upon the complicated questions raised in the arguments.
The first contract was dated December 2,1874, and the causes of damage are twelve in number, as set forth in the claimant’s reargument:
1. For preparing 980 feet lineal of bottom, at $3.00. $2,940 00
2. For sinking bulkhead crib No. 1. 600 00
3. For wastage of timber on ties, 34,944 feet b. m., at $15.00.\. 524 16
4. For building 23 crib bottoms, at $50. 1,150 00
5. For stone furnished to level bottom, 145 cords stone, at $6.90.:. 1,000 50
6. For loss of stone washed out by storms, 353 cords stone, at $6.90. 2,435 70
7. For waste of timber by sloping superstructure, 59,666 feet b. m., at $24.50 . 1,461 81
8. For liewing sides of superstructure, 2,523 lineal feet, at 50c. 1,261' 50
9. For labor in putting on wainscoting or sheathing, 141,120 feet b. m., at $4.00. 564 48
10. For labor in putting on plating, 280 lineal feet, , at $1.00. 280 00
11. For additional cost of superstructure over crib-work, 250,000 feet b. m., at $3.00. 750 00
12. For delay and expenses, 60 days, at $100 . 6, 000 00
18,968 15
The second contract was dated June 21,1875, and the causes of damage are four in number, as set forth in the claimant’s reargument:
1. For labor in framing tie-timbers, 533,748 feetb. m., at $4.50.$2,401 86
2. For breaking of crib No. 34. 640 10
3. For do. crib No. 37 ... 3, 609 00
4. For keeping up general expenses 13 days, at $100. 1, 300 00
7,950 96
*530 Many of the subjects of contention between the parties are settled in the findings of fact. The court has found that the contract of December 2, 1874, provided for the construction of 1,000 feet, more or less, of crib-work and superstructure on the shore arm of the breakwater, and that, when it became apparent that the appropriation for the year would not be exhausted by that work, the parties, by a liberal construction of the words “more or less,’ extended that contract so as to cover the construction of 500 additional feet on the same arm. These findings sweep away the issues growing out of a supposed transfer of the work from the sea arm to the shore arm of the breakwater, and dispose of claims 1, 4, 5, 8, 9, 10, and 11, under the first contract.
It is also found that the delay in the completion of the work under the first contract was not due to the acts of the defendants or their agents. This makes it incumbent on the court to refuse to allow the twelfth item of the claimant’s demand under the first contract, viz, for delay and expenses, 60 days, at $100 a day.
In the sixth claim under the first contract, the claimant demands compensation for filling a second time the cribs on the shore arm, which were washed out by the storms of September 10 and 17, 1875. The contract provided that payment for the work should be made in monthly installments, after delivery and acceptance of the materials and labor contracted for, and also that no work or material should be accepted and paid for until in a proper position in the breakwater. The work was to be at the risk of the contractor till accepted, and after acceptance was to be at the risk of the defendants.
The latter had an agent on the spot to see that the work was done according to the contract. As each crib was completed by the contractor, with the eye of the defendants’ agent ujpon him, it was sunk into place and then packed with stone. The defendants’ agent then made- estimates of the labor and material, at the contract rates, in the cribs thus sunk and packed during the month, and forwarded them to his superior as the basis for the preparation of vouchers. In due time the voucher was paid. We regard such an estimate as the acceptance of the work on which it was made. Inasmuch as estimates had been made upon the cribs which were damaged by these September storms, the court is of opinion that the cribs had been accepted, *531 and tbat they were at tbe defendants’ risk wben tbe injury took place. ,Tbe defendants’ agents were also of tbis opinion. Tbey paid tbe claimant for tbe loss of 35 cords of tbis stone, and tbe captain of engineers in charge reported tbat if it could be proved that more than tbis quantity was washed out, and tbat tbe claimant replaced it, be ought to be paid for it. Tbe amount due tbe claimant on tbis account is $2,374.83.
Tbis leaves for consideration all tbe items claimed under tbe second contract, and items 2, 3, and 7 of tbe claims under tbe first contract.
Tbe defendants set up against all these claims, 1st, receipts of tbe claimant in full under both contracts, and, 2d, tbat tbe changes were ordered by them in tbe exercise of a right reserved in each contract.
As to tbe first of these defenses, it is to be said tbat tbe receipts given on tbe vouchers prepared under tbe final estimates made on tbe two contracts respectively are acknowledgments of payment of tbe value of tbe labor and materials included in tbe estimates at tbe prices therein set forth, and are so far binding on tbe claimant. In tbe absence of proof tbat be assented to tbe correctness of tbe estimates as an estimate in each case oñ tbe entire work, and agreed to be bound by them and to make no further claim, or of proof tbat tbe payment was made and accepted in settlement of a disputed claim, we cannot give tbe receipts tbe force for which tbe defendants contend.
Copies of these receipts, certified in tbe usual way by tbe Secretary of tbe Treasury, were offered in evidence by tbe defendants. These being objected to by tbe claimant, tbe court gave him tbe option of either allowing them to be received in evidence with tbe same force which tbe originals would have bad or of a continuance. ■ He elected to waive bis objection to tbe receipt of tbe evidence. Tbis is a complete answer to tbe unusual request to have a ruling upon tbe admissiblity of evidence inserted among tbe findings of fact.
As to tbe second point in tbe defense, it is to be said tbat tbe clause upon which tbe defendants rely is to be found in both contracts. In tbe first it is stated in tbe following form:
“No variation from these specifications will be permitted without tbe consent of tbe United States engineer officer in charge of tbe improvement, to whom tbe right to make any change in tbe plans and specifications which be may at any time deem expedient is expressly reserved.”
*532 Tlie second contract varies from the first only by inserting tlie words “ or location” after tlie word specifications.”
Tlie provisions of tliese contracts concerning xiayment are somewhat anomalous. While the claimant is bound to construct and put in place the breakwater, including the preparation of the bottom of the lake to receive it and all the labor and materials included in the completed structure, his compensation for the labor employed on the whole, whether in preparing the bottom or on the actual structure, is gauged by a measurement. of the lumber employed in the work when finished. In the first contract this provision reads as follows:
“For framing, laying plank, includingall laborof construction, placing, sinking, and filling cribs, nine dollars and fifty cents per thousand feet, board measure, of timber used.”
In the second contract the rate is $9. In other resi>ects the provision is the same in the two contracts.
This mode of payment furnished an adjustable scale which both parties accepted for the measurement of all changes which the defendants might order under their reserved power, and which the claimant might accept without protest or dissent. As to all such changes, the claimant cannot recover a higer ox-other compensation than the one fixed by the contract scale.’
The claimant did object to the proposed opening in the breakwater, and he may, therefore, recover the increased expense in the sinking- of the crib to which he was put in conse-quence of it. The court finds this to be $470. This disposes of claim 2 under the first contract.
The claimant, was put to no extra expense by reason of the change of the cribs in the first thousand feet from 68 by 35 to 50 by 25. The court did not consider whether tbie reduction which the narrowing caused in the number of cubic feet in the structure occasioned any loss in profits, because it is found that the change in plan was made before the purchase of materials, and that the claimant acquiesced in it, and purchased the mate-l’ial to suit the plan as changed, and constructed the cribs accordingly, without protest and without expression of dissent. The claimant also assented to the change of the cribs in the additional 500 feet from 50 by 25 to 45 by 18. The court, therefore, regard the findings of fact as a denial of the third item in the claimant’s demands under the first contract.
The claimant also assented to the proposed change in the *533 height of the superstructure over the shore breakwater, whereby a large part of it was sloped toward the shore. He had bought the material for the superstructure as originally planned, and was obliged to cut it down in order to suit the arbitrary change. In consequence of the reduction in the measurement under the contract scale, he received a less sum than he would have received if no change had been made. In this he suffered an undoubted loss; but, as the change was accepted by him without objection, and without intimating that his material was purchased, and that he would suffer a loss by the change, the court must regard it as an exercise by the defendants of their reserved power, made with the assent of the claimant. This disposes of the seventh and sole remaining item in the demands under the first contract.
The changes which were made in the plans and specifications in the course of the execution of the second contract were also subject to the operation of another provision, which was peculiar to that contract:
“ And it is further expressly understood and agreed that no claim whatever shall at any time be made upon the United States by the party or parties of the second part for or on account of any extra work or material performed or furnished, or alleged to have been performed or furnished, under or by virtue of this contract, and not expressly bargained for and specifically included therein, unless such extra work or materials shall have been expressly required in Avriting by the party of the first part or his successor, the prices and quantities thereof having been first agreed upon by the contracting parties and approved by the Chief of Engineers.”
This alone is sufficient to preAent the claimant from recoAering any part of the first claim under the second contract. There was not a particle of evidence that the prices and quantities of such extra work Avere, agreed upon by the contracting parties, or that the same Avere approAmd by the Chief of Engineers. In the absence of a finding of such material facts, the court cannot set aside the salutary check of the contract upon the otherwise unbridled license of local agents. It was the claimant’s duty to see to it that the agent who ordered this change had authority from Washington to do so.
The claims-arising from the change in the bolts present a different question. They are not founded upon a difference in cost in the article furnished by the claimant, but upon defects in the *534 construction of the work, which the claimant maintains were caused by the change, and which he says materially altered the risks which he took under the contract.
The breakwater constructed under the second contract is in 30 feet of water at the mean level of the lake. It is constructed of separate cribs, each 65 by 35 feet, and stands one foot above the surface of the lake, without superstructure. Bach crib was completed as a separate structure before being sunk in its place, and, when completed, was towed to its place and sunk by the contractor; then it was packed solidly with stone. Until this was done, the work was to be at the contractor’s risk. Two of those cribs, numbered 34 and 37 respectively, parted before they were filled, and it cost the contractor much labor and time and some material to put them in place again. This loss would have been thrown on the contractor had there been no change in the contract. The defendants’ agent,, however, under the power reserved in the contract, made an arbitrary and apparently fanciful change in the form of the iron bolts by which the courses of these cribs were fastened together, and this change is the cause of the claims 2,3, and 4, which are made under the second contract.
The contract called for square iron bolts, headed at the top to a square one-half inch greater than the side of the bolt; the top of the head was to be flat, and it was to be joined to the side of the bolt by a wedge-shaped connection, somewhat resembling the common screw-head, except that the curve was to be concave instead of convex. The bolts were to be 30 inches long. The sides were to be parallel until they reached the place where the pointing began. The pointing was to be pyramidal, and the holes prepared for the bolts were to be of an inch in diameter.
The bolt which the defendants’ agent substituted for these was round, one inch in diameter, the head button-shaped on the top with a straight shoulder projecting one-quarter of an inch from the bolt, the sides parallel until they reached the place where the pointing began, the pointing conical, and the holes prepared for them of an inch in diameter. About six-sevenths of these bolts were 34 inches long and the remainder 42 inches.
The change thus ordered and made was a novelty. Before that time cribs had generally been constructed with square bolts. Taking two bolts of equal length, one of which is round and the *535 other of which is square, with a face equal to the diameter of the round bolt, the square bolt has the greater holding power and is less liable to break.
Respecting the immediate cause of the accident, the court in its findings says: “ Said cribs parted in consequence of the action of the sea, by which some of the retaining-bolts were drawn out and some were broken. Each crib separated at or near the line where the filling in the pockets ceased. . Had the interior pockets in said cribs been properly filled and packed with stone, neither crib would have parted.”
The claimant showed that, on his being informed of the proposed change, he expressed to the defendants’ agent, before work was done under the contract, the opinion that the 42-inch bolts would kink in driving and that the round bolts would not hold as firmly as the square bolts; but it did not appear that he protested against the change, or that, except as aforesaid, he said anything to induce the defendants’ agent to suppose that he regarded it as increasing his risk under the contract.
The claimant now contends that the damage to the cribs was the direct result of the change in the bolt, and maintains that the objection which he made to the change shifted the risk of separation during the process of filling.
The court has not found that the accident was the direct or e.Aen the consequential result of the substitution of round bolts for square bolts. The round bolts which were used were four inches longer than the square bolts which were discarded, and penetrated that much deeper into the lower timber. The result reached as to the comparative holding power of bolts of equal length is subject to modifications when applied to a comparison between bolts of different lengths. So, too, conclusions respecting the comparative power of resisting breakage do not apply to round bolts which did not break, but which drew out in the separation. The court did not feel itself justified in going further in the findings on this point than has been stated, and if it is essential to the claimant’s case that he should establish affirmatively that the injury would not have happened had the cribs been bolted with square bolts instead of round ones, he certainly has not shown it to the satisfaction of the court.
We think, however, that it would be unreasonable to require the claimant in all cases to prove this negative. The rules which we adopt for determining the respective rights and liabilities of the parties are these:
*536 1. If the claimant regarded the proposed change as entailing upon him an increased risk which he was unwilling to assume, it was his duty to put the defendants upon their guard in this respect, so that they might have an opportunity to abandon the proposed change if they desired to do so.
2. Such notice being given, the risk, in the absence of neglect or fault on the part of the claimant, would be shifted to the defendants, and in such case it would not be necessary for the claimant to prove affirmatively that the accident was caused by the use of bolts of the new form.
3. But if the accident could have been avoided by the exercise of reasonable care and prudence on the claimant’s part in selecting the time for sinking the cribs and in stowing the deck-loads intended to keep them in position till the pockets should be filled, or if the claimant was wanting in diligence in filling the pockets, then it is incumbent on the claimant to prove affirmatively that the change in the form of the bolt was the cause of the accident and that it would not have happened had such change not been made.
Applying these rules, we are of opinion that in both eases the claimant did use language sufficient to put the defendants on their guard find to shift the risk. We also think that, in the sinking of crib No. 34, the claimant took proper precautions as to the choice of the day for sinking it and as to the stowing of the deck-loads, and that he exercised a reasonable diligence in filling the pockets. We therefore think that he is entitled to recover, for the work done and materials found in replacing this crib, the sum of $640.10. As to crib No. 37, we think that he did not exercise proper precaution in the choice of the day for sinking it nor in the stowing of the deck-loads. We therefore think that he is not entitled to recover for the work done in replacing it. It also follows that he is not entitled to the fourth item in his claims under the second contract, viz, to the expenses of his establishment while replacing crib 37.
To recapitulate, the claimant is entitled to recover—
On item No. 2 in the claim set up under the first contract for sinking bulkhead crib. $470 00
On item No. 6 set up under the same for loss of stone washed out by storms, 360-^ yards, at $6.90 . 2,374 83
On item No. 2 in the claim set up under the second contract for breaking of crib No. 34.. 640 10
Total. 3,484 93
*537 And be is not entitled to recover any other or further claim set up by him as aforesaid.
Judgment will be accordingly entered in the claimant’s favor for $3,484.93
. Drake, Ch. J., was absent when this case was heard, and took no- part in the decision.