OPINION.
Davis, J.,
delivered the opinion of the court :
This is a motion for a new trial in a case which was heard and decided at the last term of this court (17 C. Cls. R., 60). The motion is made by the Attorney-General on two grounds.
*69 1st. On the ground of newly discovered evidence:
2d. Because wrong and injustice in the premises has been done to the United States.
In support of the first branch of his motion the Attorney-General contends that the evidence now offered tends to controvert certain essential statements made in the findings and the opinion of the court. The contract in question was made by Major McFarland, of the Bureau of Engineers, on behalf of the United States. The first finding finds that it was drafted and prepared by Major McFarland and his assistant engineers. The court in the opinion say that—
No limitation appears to have-been placed upon that officer’s discretion as to the details of the work, nor was any form of contract x>rescribed, nor was he directed to make his contracts subject to the approval of the Chief of Engineers. * * * If the contract had been made by the Chief of Engineers, the extra work ordered by the engineer in charge would have been without authority.
The Attorney-General contends that the new evidence submitted with his motion shows the court to have been in error in the statements in the finding and in the opinion referred to. At the same time he admits that this evidence might have been within his knowledge and control prior to the trial, and that it was not sought for by reason of an opinion that it was not necessary in law — an opinion derived from some expressions of this court in Dale's Case (14 C. Cls. R., 514).
So far as the motion is founded upon the common-law rights of suitors and defendants, it is not strenuously insisted on, and must be denied for the palpable reason that an appeal has been duly taken by the defendants, and the suit is no longer within the control of this court, except on motion made under the statute.
The second branch of the motion rests upon the provisions of the Act of June 25 1868 (15 Stat. L., 75), which are codified in the Revised Statutes, section 1088, and invokes the aid of the exceptional powers there conferred upon the court.
The claimant’s counsel contend, on the authority of Silvey’s Case (7 C. Cls. R., 305), that the measure of diligence which the common law applies to ordinary parties moving for new trials is to be applied to the Government, in motions made under this section of the Revised Statutes. We cannot assent to this proposition.
*70 The Government’s motion for a new trial in Silvey’s Case was overruled by a divided court. A bare majority of the court concurred in the judgment; only a minority of the court rested the judgment upon the opinion printed as the opinion of the court. What little authority it had, as the court was then constituted, disappeared when changes were made in the bench. In Henry’s Case (15 C. Cls. R., 162) it was substantially overruled by a full bench, on which the only dissenting judge was the judge who delivered the opinion of the court in Silvey’s Case. In order to put the subject at rest hereafter, we incorporate into this opinion the following language of the Chief Justice in his dissenting opinion in Silvey’s Case as the opinion of the court as now constituted :
Tliia motion requires ihe consideration and construction of the second section of the “Act to provide for appeals from Ihe Court of Claims, and for other purposes," approved June 25, 1866 (15 Stat. L., 75), which is in these words :
“That said Courtof Claims, at anytime while any suit or claim is pending before or on appeal from sa id court, or within two years next after the final disposition of any such suit or claim, may, on motion on behalf of the United States, grant a new trial in any such suit or claim and stay the payment of any judgment therein, upon such evidence (although the same may be cumulative or otherwise) as shall reasonably satisfy said court that any fraud, wrong, or injustice in the premises has been done to the United States; but until an order is made staying the payment of a judgment, the same shall he payable and paid as now provided by law.”
This section makes inroads upon the common-law rules in regard to new trials in the following points:
1. While at the common-law a motion for anew trial must he made while the case remains in the court where the trial was had, this section authorizes such amotion by the Government after the case has been appealed to a higher j jurisdiction.
2. It authorizes us, by granting a new trial, to oust the jurisdiction of the appellate court while the ease is pending there; which that court very justly pronounced an anomaly. ( United States v. Ayres, 9 Wall., 608.)
3. It authorizes us to grant a new trial even after the Supreme Court has affirmed the judgment of this court; which, to the legal mind, is a greater anomaly.
4. While in common-law courts a motion for a new trial must be made during the term at which the trial was had, and within a prescribed number of days after the trial, a motion under this section may be made at any time within two years after the final disposition of the suit, whether that be by the judgment of this court unappealed from, or by the judgment of affirmance in the Supreme Court.
5. The familiar and long-established rule of the common law, that a new trial will not be granted on cumulative evidence, is swept away, and upon such evidence we may grant a new trial.
*71 6. While at the common law the granting of a new trial rests ordinarily in the sound discretion of the court, the terms of this section leave ns no such discretion, if we are, upon evidence, “ reasonably satisfied ” as therein specified; for, though the language is that we “ may grant a new trial,” yet I cannot doubt that “may” there was intended to mean shall, as it usually does in statutes, the object of which would be defeated without that construction. (Minor v. Mechanics’ Bank, 1 Peters, 46.) The object of this section would be, at least, constantly subject to defeat, if it would not be actually defeated, by holding it to be discretionary with us to grant a new trial or notwhere evidence is properly brought before us sufficient to “reasonably satisfy ” us “ that fraud, wrong, or injustice in the premises has been done to the United States.”
This legislation contrasts strikingly with that regulating new trials in favor of claimants, which, in Deeson & Shaw’s Cases (6 C. Cls. R., 227), this court held to apply, and which forbids a newtrial to a claimant, “unless such reasons shall be presented as, by the rules of the common law or chancery, in suits between individuals, would furnish sufficient ground for granting a new trial.” Thus the claimants are held to those rules, while the Government prescribes for itself different ones. Legislation so unusual in making one law for claimants and another for the Government, the latter so unprecedented as to be justly styled au anomaly, must have a special and unusual intent as to the subject-matter and also as to this court, which the court should diligently seek to discover and carry out. I have very earnestly so sought, and will now proceed to state my views of the questions involved in this case.
In the first place, as to the subject-matter, the intent to throw the door wide open for the investigation, detection, and defeat of every kind, shade, and degree of “fraud, wrong, or injustice to the United States” is manifest.
X X X X X X
It is equally manifest to me from those sections, considered either together or apart, that tho legislature intended to devolve upon this court, in an express and special manner, the protection of the United States against “fraud, wrong, and injustice,” and to clothe it with powers to that end.

X X X X X X X

To perform that duty and fulfill that trust the court is bound, regardless of interfering common-law rules of practice. No such rule, as against that obligation, has, in my judgment, any force here.
These are my views of the general intent and purpose of the acts referred to, as to the subject-matter and as to this court. We will now look into the specific effect of the act of 1868 as our rule of action.
In the argument the claimant’s counsel cited, as the common-law rules in regard to new trials for newly discovered evidence, the following, viz: 1. That the evidence must be newly discovered. 2. That the party must show that he used due diligence to obtain the evidence before the trial. 3. That tho evidence must be relevant and material. 4. That the defense must be meritorious. 5. That the evidence must not be cumulative. 6. That the motion musT, be made in apt time.
The counsel admit that the fifth of these rules is superseded by the provisions of the act of 1868, and that the sixth is met, and the motion *72 in “apt time.” Only the first fom- are claimed to have any hearing on this case.
As to the third and fourth, they are not peculiar to cases of this description, but apply equally to all defenses and the evidence supjmrting them. The defense sought to be let in here would undoubtedly, if established, defeat the claimant’s suit, and it is therefore meritorious. The evidence tends to support that defense, and it is therefore relevant and material. The requirements of the third and fourth rules are therefore met. Only the first and second of those rules remain to bear upon the case. Let us examine their bearing.
In regard to the second, I deny its applicability to the Government; for, in my view, the question of diligence cannot be raised against the Government in this case, if it ever can in any. To challenge the Government’s diligence necessarily includes judicial right to hold it guilty of laches. But the settled law, as declared in repeated decisions by the Supreme Court, is, that laches cannot be imputed to the Government on account of its officers. If, then, we cannot impute laches to the Government, we may not inquire whether it has used due diligence. This rule is, therefore, as effectually abrogated in favor of the Government as that in regard to cumulative evidence is abrogated by the act of 1868.
###****
The Government being a corporate body, an impersonal entity, it can, per se, know nothing, discover nothing. But it must, in some way, know and discover a great multitude of things, and must, when it assumes the character of a litigant, be in some way chargeable with knowledge. In a suit, therefore, between it and an individual, the question arises, How is the Government to be charged with knowledge of anything pertaining to to the subject-matter of the litigation? The answer is, only through the officers or agents rypon whom, bylaw, rests the duty of acquiring and using such knowledge. In this court those officers are the Attorney-General and his assistants. What they know the Government knows; what they do not know the Government, pro hao vice, must be held not to know.
When, therefore, the question is presented whether particular evidence is newly discovered, we have, in my judgment, but one point to determine, and that is, whether it was known to those'officers at the time of the trial. If it was not, then, for the purposes of the case, it is as much newly discovered by the Government as if the Government were an individual and spoke from and of his individual knowledge. If, on the other hand, it was then known to those officers, the Government is, for the purposes of the case, chargeable with that knowledge.
Eleven years have passed since these words were read from this bench. Believing, as we do, that the course of judicial events in this court has vindicated the propriety and justice of the construction which they give to the statute, we have no hesitation in unanimously overruling the opinion in Silvey’s Case so far as it can still be regarded as authority adverse to the point now decided.
*73 This makes it necessary for us to take up the Government’s motion, and to examine the record in order to see how far the allegations on which it is founded are sustained. We will first briefly recapitulate the issues between the claimants and the. Government; the facts that have been proved and found; and the law that has been settled by the court as applicable to them. Having done this, we will next inquire what settled issues can properly be reviewed in these proceedings. And finally we will determine whether the Government has made out a case for a review of any that are reviewable.
On the 13th day of December, 1875, the claimants contracted in writing with the defendants to “do the work of repair and improvement in the first section of the canal around Big Muscle Shoals, * * * in conformity with the advertisements and specifications” attached to the contract.
The specifications thus referred to recited that—
The work to he done consists of clearing and grubbing-; the removal of tbe material that has washed into the canal; the repair, heightening, and strengthening of the embankment; and the widening and deepening of the canal trunk.
Of these four items, the first, “clearing and grubbing,” makes no figure in the present proceedings.
The “removal of the material that has washed into the canal” called for “earth excavation,” for which the contract provided payment at the rate of 24 cents per cubic yard.
The “ widening and deepening of the canal trunk” also called for “earth excavation” at the above-named rate, and further for “rock excavation,” which the contract provided should be paid for at the rate of $1.23 per cubic yard.
And, lastly, the heightening and strengthening of the embankment called for “earth embankment,” which was to be paid for at the rate of five cents per .cubic yard; and for the construction of slope walls, which were to be paid for at the rate of $1.25 per cubic yard. There is no controversy about the slope walls.
The specifications also explain why the parties made this great difference between the cost of handling earth and material which was to be put into embankments, and handling earth and material in excavating. They say:
Tie material has in no case to be raised over twelve feet, or to be removed in general over 100 feet, tbe extreme width proposed for the canal. *74 The greater part of it 'will he carried over the canal embankment and deposited on the outside. A part of it will he used to heighten the embankment about two feet.
And in a table of “approximate quantities,” which forms part of the specifications, the estimated amount of excavation in the proposed work to be done by the claimants is given at 60,000 yards of earth and 30,000-yards of rock. From all which it is perfectly clear, independently of any parol testimony in the record, that both parties contracted for a work in which the excavated earth would furnish all the material necessary for the embankment and leave a surplus which would be deposited just outside of the embankment, so that none of the earth would have to be handled twice, and none of it would have to be hauled more than one hundred feet.
Before the work was done, changes were made by Major McFarland in the plan of this section of the canal, which were so vast and so radical as to destroy the subject of the contract and substitute another in its place. Instead of a total excavation of 60,000 yards of earth, the change left but 17,000 yards to be removed, of which only 10,000 was available for the construction of the embankment, 'the remaining 7,000 being so mixed with mould, roots, and leaves as to be unfit for that purpose; and instead of 5,250 yards of embankment, as caíled for by the plans and specifications, the embankment actually constructed was raised so much above the original plan as to call for 65,603 yards of material. In consequence of this, the contractors had to find this additional material in borrowing pits at a greater distance than the prism of the canal from the line of the embankment, and were thereby put to an expense not contemplated by either party when the contract was made.
The contractors demurred to being required to do this new work until assured that they would be paid for it. Major McFarland gave them the desired assuranée, but no price was fixed. In due time, as the court has held, the claimants lodged a claim for payment. Major McFarland admitted the justice of a payment at a rate above the contract price for excavation, but insisted that the amount claimed was exorbitant. He then referred the case to Washington, where the claim was rejected, first at the Bureau of Engineers, and next by the accounting officers at the Treasury, on the following ground:
*75 The contract contained tbis clause:
And it is further expressly understood and agreed that no claim whatever shall at any time he made upon the United States hy the party or parties of the second part for or on account of any extra work or material performed or furnished, or alleged to he performed or furnished, under or hy virtue of this contract, and not expressly bargained for and specifically included therein, unless such extra work or materials shall have been expressly required in writing by the party of the first part or his successor, the prices and quantities having been first agreed upon hy the contracting parties and approved hy the Chief of Engineers.
It was found as a fact by the court at the trial that the requirement to build the additional embankment was not put in writing by Major McFarland, and tliat'tke prices and quantities of the additional work were not first agreed upon and submitted to the Chief of Engineers. On this ground the Bureau • of Engineers and the Treasury rejected the claimants’ demand for compensation for the additional work done by them outside of their contract.
It was the duty of the officer in charge of that work to report to his chief the changes which he had ordefed. There is nothing in the findings or in the record, which has been entirely opened by the course of the argument,_ to show affirmatively either that he did or did not report it. It does appear, however, that the local officer in charge had early notice that the claim would be made, and that “in anticipation of these claims” he instructed his subordinate to report upon them, and that when this report was forwarded to the Chief of Engineers no exception was taken there on the .ground of ignorance, but the objection was confined to the effect of the written contract on the claim. From all the surrounding circumstances, we think we are justified in applying to this officer the rule that an officer who is required to perform a duty is presumed to have performed it (Crussell's Case, 1 Wall., 1; 7 C. Cls. R., 276), as modified and explained by this court in Johnson's Case (14 C. Cls. R., 276). This places the United States in the position of having knowledge through their responsible agent, of the performance of the work during its progress, of acceptance of it without objection, and of refusal to pay for it on the technical ground that both parties had agreed that no claim by the contractor should be made for such work unless the Government first requésted in writing that it should be done, and unless the prices were previously agreed upon and approved by the Chief of Engineers.
*76 The claimants thereupon commenced this suit. In their petition they set forth several demands, some of which were on trial rejected, and some of which were in part allowed. It is only necessary for us, on a motion to reopen that judgment, to consider such as were allowed.
The judgment included compensation for three items:
1st. For 55,603 cubic yards of embankment at 14 cents per yard. For this embankment the claimants had already been paid the contract price of 24 cents a yard for excavation and 5 cents a yard for embankment. The court found that “it was not intended by the engineer in charge or by the claimants that this payment should include or prejudice the claimants' demand for additional compensation.”
2d. For excavating 2,580 cubic yards of rock below grade. This item is not in any sense extra work. The court in the seventh finding set forth the circumstances under which it was done, and in the opinion set forth the reasons why the United States are legally bound to pay for it under the contract, so that on the appeal already taken the defendants have a complete remedy if they have suffered injury in this respect.
3d. For raising 9,953 cubic yards of rock above the height prescribed in the contract — 7 cents per yard.
The Attorney-General contends, in the first place, that all these allowances are excessive. We must decline to consider such a proposition. We do not mean to say that a case may not arise in which it will be proper to ask the court to review its examination of the evidence and its conclusions of fact, on the ground that the judgment works wrong and injustice to the Government. But with the care which the court invariably shows in hearing counsel and in sifting facts for itself, the probability of working substantial wrong or injustice to any one in the disposition of the facts is too remote for serious consideration. In every trial of fact there must be a losing party. When it is considered how honestly and naturally every one engaged in a legal controversy is disposed to think well of his own cause and of his chance of success it he can try it over again, we have an abundant motive furnished for motions for new trials by reason of findings against evidence. But it is plain to any one practically acquainted with the subject to what a large extent litigation will be increased if they are *77 listened to and granted. (Shaw, C. J., in Miller v. Baker, 20 Pick., 288.)
The other and principal objection of the Attorney-General rests upon the new evidence submitted with his motion, and already referred to, and to the finding and opinion of the court cited in the early part of this opinion. It must be conceded that if this documentary evidence had been before the court at the trial, and placed in the findings, it would have been impossible for the court to say that no form of contract was prescribed to Major McFarland, and that he was not directed to make his contracts subject to the approval of the Chief of Engineers.
But in the view we take of the case no wrong or injustice can come to the United States in permitting the judgment to stand. For, when the court said supposititiously that “if the contract had been made by the Chief of Engineers the extra work ordered by the engineer in charge would have been without authority,” it did not intend to imply that no judgment could be rendered for the work doné outside the authorized contract. The findings show that the changes in the work which were made necessary in the plans by reason of an unexpected flood in the Tennessee River so materially altered the whole subject-matter of the original contract as to make its agreements inapplicable to the new-subject-matter as a whole. So far as work was done on a subject entirely outside of the original contract, instead of being extra work under the old contract, as the parties and the court, following the parties, inadvertently called it, it was, in fact, labor performed under a parol agreement on a matter outside the original agreement and supplementary to it. This brings it directly within the principle that governed the decision in Clark’s Case, where the Supreme Court say:
We do not mean to say that where a parol contract has "been wholly or partially executed and performed on one side the party performing will not he entitled to recover the fair value of his property or services. On the contrary, we think that he will be entitled to recover such value as upon an implied contraot for a quantum meruit. ■ (95 U. S. R., 542.)
The Attorney-General may, however, contend that the Government is in any event entitled to have the case reopened in order to have the facts so shaped that our opinion on this point can be reviewed. The answer to that is twofold:
*78 1st. That the failure to bring this documentary evidence before the court, and to have it incorporated in the findings, was not due to the negligence of the claimants nor to the laches any officer ofthe Government, as has already been stated. The act of withholding it is brought directly within that class of official acts referred to in the above-cited opinion of the Chief Justice as acts entailing responsibility on the Government.
2d. The power conferred upon the court to hear and determine motions like the present one appeals in the highest way to its discretion and sense of equity and justice. It can be invoked only in case of fraud, wrong, or injustice done to the United States, and ought never to be exerted unless it will tend to shield the United States from wrong or injustice, or to guard them against the operations of fraud. Least of all should the court allow it to be used when its utmost effect can be to interpose a technical defense against a just claim, and inflict wrong and injustice upon claimants. Here no wrong or injustice can come to the United States if we deny to its legal advisers at this late stage of this case authority to interpose a purely technical defense in order to try to escape from paying for labor and services, the full benefit of which it has received and is still enjoying. On the other hand, great injury and injustice might be done to the claimants if we were to set aside a judgment in their favor which is now bearing interest, and place their case on our calendar to be heard at the future convenience of the Government.
The motion for a new trial is denied.