Davis, J.,
delivered tbe opinion of the court.
On the 15th of April, 1872, the Commissioner of Indian Affairs at Washington instructed Enoch Hoag, superintendent of Indian affairs at Lawrence, Kans., to obtain from the different. railroads entering the Indian agency the lowest rates at which they would transport goods and supplies to the terminus of their respective roads, and also to obtain from said companies and from other responsible parties proposals for wagon transportation from the terminus to the' respective agencies. The superintendent was informed that the quantity of goods and supplies would be about the same as those purchased the previous year; and was further instructed, when the desired information should be obtained, to inclose the proposals to the Commissioner’s office at Washington, with an expression of his opinion as to the cheapest and most advantageous bid. The amount of such goods and supplies transported to the Indian agencies the previous year was about 1,600,000 pounds.
• In pursuance of his instructions, the Commissioner published an advertisement inviting such proposals to be furnished before the 1st day of Juno, 1872. The advertisement contained the usual clause, informing bidders that ample bonds would be required for the prompt'and certain deliveryof the freight as provided in the contract.
The railway transportation for which bids were then invited was awarded to the Atcliinson, Topeka and Santa Fé Railroad Company, and forms no element in the present contention.
The bids for the wagon transportation were opened at Hoag’s office on the 1st day of J une. Among the bidders were the claimants, Moses Neal and Thomas Murphy, who resided near Hoag’s office, and were in the habit of frequently coming there, and also one G. W. Russell.
' On the same day Hoag verbally informed the said Neal & Murphy that their bid would be accepted, but he did not communicate the bid to the Commissioner at Washington until the 7th of June. It is not contended that Hoag had any authority to make this communication to the claimants, Neal & Murphy, or that they acquired thereby any rights egainst the defendants.
Neal & Murphy, on the same 1st day of June, before their bid was communicated to the Commissioner, associated with *282 themselves the other claimants, William R. Bernard and James M. Piper, who were the owners of a large number of oxen and horses and freight-wagons, and paid to said Bernard and Piper a large sum of money for an interest therein, in order to use said property in executing the proposed contract; and all the said means of transportation were ordered to rendezvous at once at Wichita, in Kansas.
On the 7th of Juue the claimants, Neal & Murphy, and the superintendent, Hoag, executed the contract on whidfithe claimants rely, and they, with the claimants Bernard and Piper, as sureties, executed the required bond for its faithful performance. This contract provided for the transportation of 1,500 tons of freight. It does not appear that Neal <& Murphy at that time disclosed to the defendants their association with the claimants Bernard and Piper; and the fact that they offered those parties as independent sureties on the bond for their performance of their contract would seem to preclude the idea that the connection was so disclosed.
On the same 7 th of June, Hoag sent this contract and the bond for insuring its execution by mail to the Commissioner, with a letter advising its approval. The Commissioner received this letter on the 11th of June, and on the 12th he telegraphed to Hoag that Neal & Murphy’s bid was accepted. Hoag received this telegram on the 14th.
Meanwhile, however, Russell, whose bid was lower than Neal & Murphy’s, had telegraphed to the Commissioner that he had had no notice or opportunity to close a contract for wagon transportation, and that he was prepared to give good bonds. On the 13th of June the Commissioner telegraphed this to Hoag, and instructed him to give the matter due consideration, notwithstanding. the telegram of the previous day. After the receipt of the second telegram, Hoag, on the 15th of June, communicated both of them to the claimant Murphy.
No contract was made with Russell, and no security for the performance of a contract appears to have been offered by him. The Commissioner of Indian Affairs caused said contract with Neal & Murphy to be recorded in his office in Washington and to be filed in the office of the proper Comptroller of the Treasury in the manner in which contracts recognized as valid by the department are required to be deposited. (Act 16th July, 1798, c. 85, § 6, 1 Stat. L., 610; Rev. Stat., § 3743.)
*283 On tbe 17tb of June, Walker wrote thus to Hoag:
“ Referring to two telegraphic dispatches, dated the 12th and ■ 13th inst., respectively, I have to advise you that, while in the agreement made by you with Neal & Murphy for the transportation of annuity goods and supplies, transmitted to this office in your letter of the 7th inst., it is agreed to deliver 1,500 tons, more or less, the whole amount of goods and supplies purchased by this office tor distribution to the Kiowas and Oo-manches, the Wichitas, &c., and the Cheyennes and Arapahoe», will not exceed 250 or 300 tons.
“This information is communicated for your guidance and that of the contractors.”
The Commissioner appears to have been induced to make this modification by the fact that he had made a contract in Washington on the Gth of June for the delivery at the agencies of much the larger part of the supplies which had the previous year been purchased by the government and transported at its expense to the agencies. The counsel for the defendants at the trial laid much stress upon this contract; but, except as furnishing an explanation of the change of mind of the Commissioner between the 12th and the 17th of June, it is of no importance.
It does not appear whether Hoag communicated the information contained in Commissioner Walker’s letter of the 17 th June to Neal & Murphy before the 28th of June.
In the interim he entered into some explanatory correspondence with the Commissioner with reference both to the railway contract and to Neal & Murphy’s contract. As ■ to the latter, Hoag said that the contractors “ supposed that they were contracting for all the supplies purchased for the agencies. If they are deceived they should be informed, as they are holding in reserve transportation in pursuance of the advertisements.”
On the 28th of June, Hoag made an official' communication to Neal & Murphy of the intelligence contained in the Commissioner’s letter of the 17th of June. On the same day they replied to him as follows':
“We have yours of this date, notifying us of the approval by the dep’t of our bid for the transportation of Lid. stores, and inasmuch as there now seenis to be some doubt about the flour and bacon being included (for which we liave provided transportation), we would ask that the remaining stores (which we notice by the advertisement for purchase were to be ready for delivery by the 15th of June) be forwarded at once, *284 as our trams are in waiting at Wichita City to load; also, let us know, at your earliest convenience, the probable ain’t, including the annuity goods.”
ileal & Murphy’s letter of the 28th of June was communicated in due course to the Commissioner. The latter, on the 6th of July, replied that the contract was approved by the Commissioner, with the understanding that there will not, in all probability, for the reason that contracts have been made for delivering the flour and the bacon at the agencies, be more than 300 tons to be transported.”
This terminated the correspondence on this branch of the case; and it is maintained by each side that the rights of the parties were by this time fixed and determined.
The claimants contend that their contract was ratified by the Commissioner on the 12th of June, in the telegram the substance of which was communicated to them on the 15th of June, and that the record and filing of the contract without note that the amount of transportation under it was reduced were further acts of ratification.
The defendants contend that the Commissioner’s approval of the 12th of June was withdrawn by the telegram of the 13th, which was received at the office of the superintendent before the information in the telegram of the 12th had been communicated to Neal & Murphy; that Hoag’s communication of the 15th to Neal & Murphy, if the act can be called the act of Hoag, was unauthorized and without effect; that the first authorized communication of the acceptance of their bid was made on the 28th of June, under the authority derived from the letter of the 17th of June; and that the only approval of the contract was contained in the letter of the 6th of July.
If the case stopped here it would be necessary for us to pass upon these contentions; but negotiations and transactions eventually took place between the parties which materially weakened the position of the defendants in law and comx>letely changed their case on the facts.
The claimants, finding that their transportation under the contract was to be reduced to something like 300 tons, voluntarily broke up the large force which they had collected together and sold out at a large loss. The government failed to supply the. whole of the much smaller amount of transportation which the contract as changed by them called for. The whole of what *285 was actually furnisbed was carried by subcontractors at a profit to file contractors of 28| cents for each 100 pounds carried 100 miles.
Some two years later tbe defendants, after protracted negotiations, paid to tbe claimants tbe sum of $18,037.60 for tbe damages Avhicli bad been sustained by them by reason of tbe defendants’ failure to furnish freight under tbe said contract to the full amount of 1,500 tons.
Such a payment between individuals would constitute one of tbe strongest evidences of tbe ratification of tbe act of an agent bearing tbe relation towards bis principal which Hoag bore to tbe Commissioner of Indian Affairs. Tbe defendants, however, contend not only that tbe payment did not amount to a rati-' fication, but that it ivas illegal and may be recovered back.
Tbe payment was made with tbe approval of the Secretary of tbe Interior and of tbe proper accounting officer of tbe Treasury. We are neither disposed to deny tbe authority of tbe Secretary of tbe Interior to ratify this act of bis subordinate nor to review or question tbe right of the Treasury to approve and pay tbe account which bad thus been adjusted in tbe Department of tbe Interior. We confine ourselves to tbe consideration of tbe legal effect of these acts. On this point we can have no doubt that they amounted to a complete ratification of tbe original contract of tbe claimant as a contract for tbe transportation of 1,500 tons, more or less. Tbe defendants furnisbed for transportation not quite one-sixtb of 1,500 tons. Tbe claimants would have been ready and willing to transport tbe whole amount but for the act of tbe defendants.
Therefore, it only remains for us to consider whether tbe settlement between tbe parties left anything open for further demand by tbe claimants, and if it did leave anything open, then to what extent tbe claimants have been injured beyond what they have been already compensated for.
After transporting tbe goods offered for transportation under tbe contract, and receiving pay therefor at the contract rates, tbe claimants began their negotiations for tbe payment of damages by lodging with tbe Second Auditor of the Treasury, on tbe 8th of May, 1873, a claim for tbe actual expenses incurred by them by reason of being prevented by agents of tbe government from fully performing their contract. This was accompanied by tbe further statement that they would afterwards insist upon com *286 pensation for the loss of profit, to wit, the difference between the contract price of tlie service and the actual cost at which the claimants were prepared to perform the same. They further stated that they did not then present the latter claim for consideration, for the reason that it was a matter proper to be determined by another tribunal. This claim was rejected by the accounting officers of the Treasury.
The claimants then addressed themselves to the Department of the Interior. On the 13th January, 1874, they transmitted to the head of that department their claim for reimbursement in a letter, in which, among- other things, they said: “We claim that under uniform precedents the claimants are entitled to be repaid by the government as a matter of account in the executive branch of the government for moneys thus expended.”
This letter was transmitted by the Secretary of the Interior to the Treasury, whei’e the claim was at first rejected by the accounting officers. Subsequently, on a renewed application by the claimants’ attorney, it was taken up, reconsidered, and the payment already alluded to was made.
In all these transactions the claimants carefully guarded and preserved whatever rights of action they may have had for breach of contract by the defendants in not furnishing- transportation to the amount of 1,500 tons, more or less.
In Finding XVIII, the bill or memorandum of the claimants’ claim for reimbursement is set forth as follows:
For the outfit. $36, 750 00
For the cost of getting the same to Wichita.. 3,590 00
For the cost of keeping the same at Wichita. 3,590 00
For the cost of taking care oí cattle to October 20th. 1, 620 00
For the cost of feeding same near Kansas City_ ‘ 819 00
Total amount paid out. 46,369 00
The amounts realized from sales were:
Cattle sold.. $21, 681 40
Wagons sold. 6,100 00
Horses and camp outfit. 550 00
28,331 40
Total loss on the enterprise. 18, 037 60
The defendants were not liable to make good to the claimants the losses which they may have suffered, either in *287 tbe sale of the property which they brought to Wichita in order to fulfill their contract, or in the cost of bringing it there. Before the contract was made, they were the owners of the property, and had given orders for it to come to Wichita, on the sx>eculative risk that they would secure a contract which would enable them to use it profitably. Before the Commissioner gave his assent to the contract — even as an obligation to furnish 300 tons for transportation — all this property was at Wichita. The claimants took their own risk in the business. They had no more right to charge the defendants with the cost of bringing the property to Wichita or with the alleged losses on the sale of it there than they would had have in case no contract had been made.
In measuring the damages suffered by the caimants from the defendants’ breach of this contract, we are to be guided by the rule laid down by the Supreme Court in Speed’s case, and we are to find “the difference between the cost of dping the work and what the claimants were to receive for it, making reasonable deduction for the less time engaged, and for release from the care, trouble, risk, and responsibility attending a full execution of the contract.”
The contract with the claimants required the defendants to furnish them for transportation 1,500 tons, more or less, to be carried a distance which is found to be an average distance of 205 miles. The claimants, in their petition and in their brief, estimate this amount at 3,000,000 pounds, and we adopt their estimate as the measure of their claim. For this service they were to be paid at the rate $12S£ per 100 pounds per 100 miles. The actual cost of doing the work was $1 per 100 pounds per 100 miles.
The defendants furnished for transportation only 462,478 pounds. If we give no force to the words “ more or less” (which must not be taken to be the court’s construction of the sense of these words in the connection in which they stand in the contract), the defendants tailed to furnish 2,537,522 pounds for transportation, according to the terms of the contract. Had this amount been furnished by them, and had the claimants performed the service, they would have been entitled to compensation therefor at the contract rates, amounting in the aggregate to $66,074.72. The necessary cost for doing said work would have been $52,019.20, and the profits which the claim ants would have gained would have been $14,955.52.
*288 The claimants contend that they are, in áddition to this sum, entitled to the whole of the losses which formed the basis of the payment of the $18,037.60. We have already shown that they are not entitled to reimbursement for their alleged losses in the outfit and in bringing it to Wichita. We will now consider the remaining items.
The third item amounts to $3,590, and is for keeping the outfit at Wichita. It appears by Finding XI that the trains were disbanded on the 20th July, and that the hands were paid up to the 1st August. This item refers to expenses incurred during the month of July. It appears in Finding XIII that freight was furnished for transportation in July and August, but at what times and to what extent does not exactly appear. On the 9th of July, I-Ioag is telegraphing to know when the freight will be shipped (Finding XII), and on the 23d of August, Bernard and Piper, having already transported 150 tons, are waiting for freight, at Wichita ,City (Finding XIII). It is fair to assume that the transportation of this freight might have furnished employment for at least a part of the train in July, if the claimants had not subcontracted the carrying; but sufficient data are not l'urnishedto enable us to determine how much was transported in that month.
■The last two items in the memorandum relate to the care and feeding of the cattle. They appear to have been kept some two months, presumably to fit them for market. If the claimants are entitled to be reimbursed for any part of the losses, these items would seem to be fairly losses occasioned by the defendants, breach. At any rate, the claimant have received payment for them.
Stating the account on the principle laid down, but making no allowance to the defendants for the July service, we reach the folloAving result as the most favorable possible for the claimants :
Loss of profits... $14, 955 52
Cost of keeping outfit. 3, 590' 00
Cost of keeping cattle. 2,439 00
20,984 52
They have already received from the defendants.. 18,037 60
Leaving a balance of. 2,947 92
*289 Dueler tbe rule in Speed’s case tbe defendants are entitled to a reasonable deduction for tbe less time engaged, and for tbe claimants’ release from tbe care, trouble, risk, and responsibility attending a full execution of tbe contract. In this case tbe claimants were early notified tliat a full execution of tbe contract would not be required, and they virtually were released from all care and anxiety witbin a month after tbe term began. Under these circumstances 20 per cent, of tbe expected profits is a deduction most reasonable to the claimants. This amounts to $2,991.10, and leaves nothing due them.
Tbe defendants evidently intended tbe payment which they made in March, 1875, as a complete settlement. They set aside tbe bill of items prepared by tbe claimants, and prepared tbe voucher on which tbe payment was made, which shows that tbe money was paid by them as a generalcompensation “for damages sustained in 1872 and 1873 by reason of tbe failure of tbe government to furnish freight to tbe full amount of 1,500 tons for transportation from Wichita, Kans., to tbe Upper Arkansas, Kiowa, and Wachita Agencies, or to such other points in tbe Indian Territory as might be required in accordancé with their contract with tbe United States, dated June 7, 1872. ”
Tbe claimants did not accept tbe payment thus made as full compensation for tbe said damages, but tbe court is of opinion that they are not entitled to recover any further sum therefor.
The view which we take of tbe merits of tbe case renders it unnecessary to consider tbe effect of tbe act of tbe claimants Neal & Murphy in associating tbe claimants Bernard and Piper with them in tbe execution of tbe contract and of tbe right of tbe latter to a judgment.
Tbe claimants’ petition must be dismissed.