Nott, J.,
delivered the opinion of the court:
This is an action for work and services rendered to the defendants in the reconstruction of tbe canal around Muscle Shoals, on •the Tennessee. The petition sets up a formal, express contract, and alleges that a certain amount is due thereon for work performed by the claimants in accordance with its terms; but the chief demands of the claimants are for extra work rendered at *75 the request of tbe engineer in charge of the work, or made necessary by a departure from the plan contemplated by the contract, which departure was ordered bj tbe same officer. There is a provision in the contract that “no claim whatever shall be made by the parties of the second part for or on account of extra work or material performed or furnished under or by virl ue of this contract and not expressly bargained for and specifically included therein, unless such extra work shall have .been exjpressly required in writing by the party of the first part, the prices and quantities thereof having been first agreed u]>oriJhl-thcontracting parties and approved-by-the Chief of Engineers.” It is conceded by the defendants that the extra work Avas ordered by the engineer in charge; that it was duly performed, and. that its quality has been approved and its quantity determined in the manner prescribed by the contract; but it is contended that this provision requiring the order to be in writing precludes the court from deciding the case upon its merits.
We are aware of no principle of law by virtue of which courts can transmute a contract into a statute of frauds, and attach to the voluntary agreement of the parties the irrevocable and mandatory attributes of an act of Congress. The law-making power, upon considerations of public policy, may declare certain contracts void and certain transactions remediless; but where one man renders service or furnishes material to another with his consent or at his request, the law implies a contract, and no prior agreement of the parties can render a transaction illegal and AToid which the law declares to be legal and valid. ¡Such provisions as that aboATe quoted were devised and introduced into building contracts to control and limit the power of architects or superintendents, to the end that the OAvner should not be led into an unauthorized expense through the orders and directions of his agents. As to the principal, such provisions merely impose a condition Avhich may be waived. The parties to a contract cannot repeal a statute of frauds, but they may by a subsequent oral agreement Arary the terms of their Avritten contract, “or may waive and discharge it altogether.” Hawkins’s Case (96 U. S. R., 689.) The question, therefore,' which really is presented by this case is one of agency.
In applying the law of agency to the transactions of the government, it has not been the purpose of the Supreme Court, *76 nor of this, to shackle or curtail the lawful and reasonable powei’s of the executive. Both courts have sought with great unanimity of decision to uphold the necessary discretion of the heads of the executive departments and other responsible officers of the government, but at the same time so to apply the law that subordinate and irresponsible agents should not bring upon the government an unauthorized indebtedness through the medium of implied contracts. In this application of the law of agency to the affairs of the government, the courts have also recognized the principle of ratification, and have held that ratification by the head of an executive department, or other responsible officer, could render a contract effective and valid which otherwise would be unauthorized and inoperative. There are two cases clearly illustrative of these positions, to which we may well refer.
The first of these is Hawkins’s Case (12 C. Cls. R., 181; 96 U. S. R., 689), where the contract was made virtually by the Secretary of the Treasury, and provided that there should be no departure from its terms without his written consent, but where the local superintendent of the government had ordered a different and more expensive wall to be erected than the contract required. It was held that the claimant could not recover for the added value of the work, and that he should first have procured the consent of the Secretary, or at least have notified . him of the change ordered b3r the local superintendent, and of the additional expense which the change would necessitate.
The second is Neal & Murphy’s Case (14 C. Cls. R., 280), where a contract for the transportation of Indian supplies had been entered into by a superintendent of Indians, which was utterly void for want of authority in the superintendent, but where payments upon the contract had been ordered by fhe Commissioner of Indian Affairs with the approval of the Secretary of the Interior. This court said: “ Such a payment between individuals would constitute one of the strongest evidences of the ratification of the act of an agent bearing the relation towards his principal which Hoag [the superintendent] bore to the Commissioner of Indian Affairs.” And the court added: ‘.‘We are neither disposed to deny the authority of the Secretary of the Interior to ratify this act of his subordinate, nor to review or question the right of the Treasury to approve and pay the account which had been adjusted in the Department of the Interior. We con *77 fine ourselves to the consideration of the legal effect of those acts. On this point we can have no doubt that they amounted to a complete ratification.”
Such being the declared law of public agency, what are the facts of this case to which the law must be applied?
In' 1875 the work of improving the navigation of the Tennessee had been placed’ under the charge of Maj. Walter McFarland, of the Engineer Corps. In September of that year, that officer recommended that the money which had been appropriated by Congress for the improvement of the river below Chattanooga be applied to the repair and reconstruction of an old canal which many years before had been constructed around Big Muscle Shoals. The Chief of Engineers, who in such matters represents the War Department, replied, approving the suggestion and directing Major McFarland to advertise for proposals and proceed with the work. No limitation appears to have been placed upon that officer’s discretion as to the details of the work, nor was any form of contract prescribed, nor was he directed to make his contracts subject to the approval of the Chief of Engineers. Major McFarland, after due advertisement, entered into a contract with the claimants, which contemplated their building an embankment of a certain height and consequent size. While the work was going on, a freshet" in the river disclosed the fact that the intended embankment was not high enough to keep out the waters of the river. Major McFarland thereupon ordered the contractors to carry the embankment higher, and consequently to build a larger embankment. This new embankment; so ordered .required more than twelve times as much work from the claimants as.the one originally contemplated. In May, 1876, the Chief of Engineers, upon the report of the engineer in charge, ordered that the claimants’ time for completing their work be extended, and in September he again granted a further extension. During the progress of this extra work the appropriation was transferred to the hands of the engineer in charge, and payments -were made to the contractors certainly with the concurrence, and never with the disapproval, of the Chief of Engineers or of the Secretary of War. When the claimants’work was finished it was accepted, and the usual percentage which had been deducted from previous payments was paid to the contractors. About the time when this payment of arrearages was made— *78 in fact, a few days before tbe payment — tbe claimants bad presented their demand for extra compensation for this very work, and that demand bad been forwarded by tbe engineer in charge to tbe Chief of Engineers, and by him to tbe Secretary of War, and by him was submitted to the Second Comptroller for bis opinion, and from first to last this work ordered by tbe engineer in charge was never disapproved, nor payment therefor ordered to be stopped; nor bis authority in ordering it questioned ; nor was any objection ever raised to tbe claimants’ demand except that going to tbe rate of compensation.
If tbe contract in this case bad been made by tbe Chief of Engineers, tbe extra work ordered by the engineer in charge would have been without authority and at tbe risk of tbe contractors, and tbe case would be like that of Hawkins (supra). Or if tbe extra work, instead of having been ordered by tbe officer who made tbe contract, bad been ordered by tbe local assistant engineer who supervised tbe work, it would have been an order prohibited by tbe contract, and tbe case would have been like that of Braden & Angus (1G O. Cls. B., 389). But here Major McFarland bad tbe same authority to order the extra work that be bad to make the original contract. Tbe extra work was equally within bis discretion, and it no more required tbe approval of tbe Chief of Engineers than did tbe formal written contract of which it was a variation. Furthermore, tbe authority and discretion of Major McFarland in ordering tbe height of tbe embankment to be increased was questioned neither by bis'successor, under whom a large part of the work was done, nor by his superior, the Chief of Engineers, who exercised an official and professional supervision of bis proceedings, nor by the Secretary of War, who ultimately bad tbe matter of this extra work brought to bis personal notice. This acquiescence on the part of high officers of tbe government, in whom' the power of ratification undoubtedly was, coupled with tbe facts of acceptance and payment and extension of the time wherein tbe claimants might perform it, constitute a ratification of tbe most unequivocal character.
Concluding, therefore, that want of authority in tbe engineer in charge to order this extra work cannot be set up to defeat a consideration of tbe case upon its merits, we proceed to inquire whether tbe claimants have precluded themselves from demanding a higher rate of compensation than that which tbe *79 contract prescribed and which has been allowed and paid to them.
In cases where a public agent has requested a departure from / an express contract, it has uniformly been held that if the ! change ordered was of such a nature that the agent might rea- i sonably suppose no additional expense would be caused, the ' contractor was bound to speak or otherwise he would be deemed/ to have consented to make the substitution at the contract price or rate. But, conversely, where the change ordered was of such a nature that it would necessarily involve additional cost to the contractor, it has been held that no notice was necessary] and that the contractor could recover his reasonable compensa-1 tion, following in the ascertainment thereof the clear and rea- * sonable rule laid down by the Supreme Court in Dermott v. Jones (2 Wall., 1). In the present case it appears that at the time when Major McFarland ordered the embankment to be enlarged, the claimants inquired “ whether, as the excavation in the canal trunk would not furnish all the material required for the embankment, they would be allowed payment for excavating outside,” and to this Major McFarland replied “that they would be.” (Finding IV.) Neither the inquiry nor the reply is desirably clear; but as the material taken from the prism of the canal amounted to only 10,000 cubic yards, while the material excavated outside amounted to 55,603 cubic yards, it is manifest that neither party could have expected the latter work to be done for absolutely nothing. The reasonable, and indeed the only rational, interpretation tobe put upon the words “ whether the claimants would be allowed payment for excavating outside” is that the claimants intended to inquire whether they would be allowed payment for the extra trouble and expense of excavating outside. Moreover, it appears that the distance which this outside earth had to be moved was about double the distance of earth procured within the prism of the canal; that it had to be carried up an increased elevation, and that it had to be procured from borrow-pits, which had to be stripped of underbrush, vines, leaves, a net-work of robts, and a mass of decayed vegetable matter. (Finding III.) In other words, it appears that the moment the work of excavating should pass from the prism of the canal to the outside borrow-pits, the work of the additional embankment must be prosecuted at a largely increased cost to the contractors. In *80 such a case it seems certain that tbe agent of tbe government must have understood that souiuch of the new work would involve a higher rate of compensation than the original contract-prescribed ; and it seems not unlikely that if Major McFarland had continued in charge of the work till the end,, this increased rate of compensation would have been adjusted by the contracting parties; that is to say, by him and the claimants.
A second cause of action set up by the claimants is for additional compensation for building a dam across the canal by order of Major McFarland. It was contended by the defendants’ counsel that as this dam was not a permanent structure, it was therefore one of the temporary dams which the contract provided the claimants should erect at their own expense for the protection of their own work. A sufficient answer to this is that the. dam was ordered after the claimants’ embankment was built, and that the defendants’ engineers in charge, and Chief of Engineers, have all treated the dam as work done at the defendants’ request and for their benefit. But this branch of the case differs from the preceding one in several essentials: First, the claimants said nothing to the engineer which would lead him to believe that an increased rate would be demanded; second, the excavation was not of a nature which must necessarily be more expensive than the work contemplated by the contract; third, the claimants accepted pay for it, and gave receipts, and made no specific demand for additional compensation before final payment. Our conclusion is, that by so doing they are precluded from seeking- additional compensation.
A third cause of action set up by the claimants involves a construction of the contract, and the services to which it refers are not in the nature of extra work, nor were they caused by any departure from the contract.
The general purpose of the contract, as declared by itself, was that the claimants should “do the work of repair and improvement in the first section of the canal around Big Muscle Shoals.” It contemplated rock excavation, and provided a rate of compensation therefor. All that the contract says in regard to compensation is this: “Rode excavation at the rate of $1.23 per cubic .yard.” All that the specifications say of the work of excavating is this: “ The thickness of rock to be removed varies from four feet to a few inches.” Whether this term “thickness” refers to the thickness of the strata, or to the thickness from *81 the imaginary plane of the intended bottom of the canal to the upper surface of the rock, is not stated.
If the strata of the rock had been parallel to the grade line of the canal, that is to say, if they had run in precisely horizontal planes; and if the cleavage of the strata had been found precisely where it was wanted, that is to say, at the intended depth of the canal, there would be no controversy now between the parties. But such a state of things would have been phenomenal, and no man could have supposed it to exist. The means resorted to by the claimants were the ordinary and proper means for rock excavation; that is to say, drilling and blasting. The engineer who.made the contract anticipated that the work would be carried on by these means, and neither he nor his successor raised any objection either to the means or the method of the claimants as their work progressed. In order that the canal might be deep enough, the whole of a stratum would have to be broken up by blasting, and when the rock, so blasted, was removed, the actual would slightly exceed its theoretical depth. Should the claimants, according to the true intent of this contract, be paid for the quantity actually excavated, or for a theoretic quantity estimated from the grade line of the bottom of the canal?
That this question is a doubtful one even among experienced government engineers is attested by the fact that the vigilant engineer in charge, Captain King, was in doubt as to whether he should determine it for or against the claimants, and that he referred it to his superior officer for his determination.
“It would have been physically possible,” the findings say (YI), “for the claimants to have excavated to the grade line without going below it; but such work would not be designated as ‘rock excavation’ among engineers and contractors, but as ‘rock cutting,’and would have required a more skilled class of laborers, and would have been a more costly kind of work.” Of course the defendants, by handing the contractors a profile plan of the canal and telling them to excavate to the bottom grade line, could not have secured “rock cutting” or chisel work when they had contracted for nothing better than “rock excavation” or drilling and' blasting. We may, therefore, regard the means employed by the claimants as practically the only means for prosecuting that kind of work, and may also regard the surplus of rock taken below the grade line as a neces *82 sary and inevitable loss incident to tbe work of deepening tbe canal, wbicb must be borne by one party or tbe other, according to tbe reasonable intent of tbe contract.
If the contract bad bound tbe claimants to construct a canal according to a certain plan, or to excavate rock and earth down to a certain line, there would be little doubt that their pay must stop when that line was reached, and that excavation below it was an expense incident to the prosecution of their work. But here tbe contract is not for excavating to a designated line, but is simply for excavating, and tbe designated line comes into tbe case through tbe subsequent directions and measurements of tbe other party’s engineers. Tbe contract was draughted and prepared by the defendants’ engineers, and should have contained a clause which would not have left the matter in doubt. A designated line would have been a limitation upon tbe contractors’ compensation, but when tbe contract wbicb tbe defendants themselves prepared contains no such limitation, we do not feel at liberty to import it into tbe case by implication.
A fourth cause of action is for tbe additional expense cast upon tbe contractors in being compelled to raise rock more than 12 feet, tbe maximum height designated by tbe contract. Tbe engineer in charge decided that this item was well founded, and tbe controversy is really as to tbe rate of compensation, the one party,claiming forty cents per cubic yard, the other conceding one cent. The findings of the court fix the value of the additional service, and judgment will be accordingly.
The judgment of the court is that the claimants recover of tbe defendants—
For 55,G03 cubic yards of embankment, at 14 cents
per yard..:.$7,784 42
For excavating 2,580 cubic yards of rock, at $1.23
per yard... 3,173. 40
For raising 9,953 cubic yards of rock, 7 cents .per
yard... 696 71
Amounting in tbe aggregate to... 11, 654 53
Drake, On. J., dissented.