VENABLE CONST. CO. v. UNITED STATES.

(Circuit Court, N. D. Georgia. February 11, 1902.)

No. 1,543.

1. CONTRACT FOR PUBLIC WORK—LIABILITY FOR EXTRA WORK OR MATERIAL.

Where the engineer in charge of the construction of a government fortification, having authority to designate the work to be done and the materials to be used by a contractor, requires work or materials which are not fairly within the contract, and the contractor complies with such requirement, as he is compelled to do or suffer loss by the abandonment of his contract, he is entitled to recover the extra cost of such work or materials, notwithstanding a provision of the contract that no claim for extra work or material should be made or allowed unless previously agreed upon in writing.

2. SAME.

Where a bidder for government work, as required, submitted a sample of sand proposed to be used, which was approved by the engineer in charge, and the contract was made upon that basis, but a succeeding engineer required the contractor to use a different sand, which was more expensive to him, he is entitled to recover the extra cost of the same in addition to the contract price for the work.

3. SAME.

A contractor for the construction of a government fortification, required by his contract to erect a building suitable for use in testing cement, who at the request of the engineer in charge built a cottage at a considerably greater cost than was necessary for the purpose of testing cement, but without objection or protest, will be deemed to have voluntarily incurred the extra expense, and is not entitled to recover the same from the United States.

4. SAME.

A government contractor who agreed to construct the work in accordance with detail drawings, to be thereafter furnished, is not entitled to extra compensation because the drawings first furnished were changed before the work was done, and the cost of certain work was greater under the second drawing than it would have been under the first: nor can he recover extra pay because the drawings, which were consistent with the specifications, required certain work to be done in a better and more expensive manner than he supposed would be required.

5. SAME—ALLOWANCE FOR EXTRA WORK—PROFIT.

A contractor who has been required to furnish materials and do work not within his contract is entitled to recover, in addition to the actual cost to him of such materials and work, a reasonable sum as profit.

At Law. Action against the United States to recover for extra work done and materials furnished in the construction of a fortification under a contract.

Hoke Smith and H. C. Peeples, for plaintiff.

E. A. Angier, Dist. Atty., and Geo. L. Bell and W. L. Massey, Asst. Dist. Attys., for defendant.

NEWMAN, District Judge. This is a suit brought by the Venable Construction Company against the United States to recover $9,981.07. The suit grows out of a contract entered into by the plaintiff with the United States, through O. M. Carter, the engineer

officer in charge, for the construction of certain fortifications called "gun emplacements," on Tybee Island, near Savannah, Ga. The contract for this work was entered into on November 30, 1896. The character of the contract, so far as material here, will appear in the discussion of the several items embraced in this suit. The case involves a claim for certain work done which is said to have been extra work. The items set out in the plaintiff's declaration and relied on here are as follows:

For additional work upon cut stone............................... $2,650 00
For 38,649 pounds of conduit pipe, at 4 cents per pound........... 1,545 96
For change in plan of doors and extra work thereon............... 900 00
For cottage ..................................................... 949 95
For change in sand.............................................. 3,935 16

Total ...................................................... $9,981 07

The United States having filed an answer denying liability for the several items of extra work claimed, the case was, by consent of counsel for the respective parties, referred to an auditor. The auditor made a thorough investigation of the case, and apparently heard the evidence of every one who could throw any light on the transaction, except Capt. O. M. Carter. His testimony was not taken. After hearing the testimony thus presented, the auditor made a report finding in favor of the plaintiff as to each of the items in controversy. The separate claims are here considered in the order in which they can be most conveniently disposed of.

### Findings of Fact.

At and before the contract was entered into, on November 30, 1896, plaintiff had only seen what are called "typical plans" of the work to be done; that is, a general outline and plan of the proposed fortification. The detailed plans and specifications by which the work was to be done were furnished later. As to only one of the items involved does any indication appear to have been given as to precisely what would be required. It does appear, so far as can be gathered intelligently from the testimony in this case, that samples of sand such as was to be used in the construction of the battery were furnished, and that an agreement was reached between the engineer officer in charge and the president of the construction company, by which it was understood that the construction company might use one-fourth sharp river sand from the river above Savannah, and three-fourths beach sand, to be obtained from the beach below Savannah, properly mixed and combined. Samples of the sand proposed to be used were furnished by the representatives of the construction company to the engineer officer in charge, and there is sufficient evidence to justify the auditor's conclusion that there was an acceptance on the part of the officers of the government of the proposal to use sand in the proportions above referred to. There was some correspondence on the subject of the character of sand to be used, and a letter from Capt. Carter to the Venable Construction Company of June 9, 1897, shows that the

construction company was required to use all river sand from the river above Savannah. But in a letter written June 16, 1897, this requirement was changed, and the construction company was allowed to use one-fourth sand obtained from above the city, and three-fourths beach sand obtained below the city. After this, and during the time that Capt. Carter was in charge of the work, the construction company was allowed to use sand in these proportions.

On the 20th day of July, 1897, Capt. C. E. Gillette superseded Capt. Carter in charge of the work, and he directed and required that all the sand to be used should be taken from the river above Savannah. The evidence is undisputed that the additional expense of bringing this three-fourths of the sand from the river above Savannah, instead of obtaining it down near where the battery was being constructed, was considerable. The finding of the auditor on this item is as follows:

"Sand: Paragraph 44 of the specifications provides as follows: 'The sand shall be clean, first-class quality building sand, containing a suitable mixture of fine and coarse, sharp grains, free from dirt, organic matter, and other impurities. Bidders will submit with their proposals a sample representing the particular sand they propose to furnish, and will state in their proposals the location of the bank or banks from which it is to be obtained.' Plaintiff's bid contains the following statement: 'Sand, samples of which are furnished, to be of like quality, and acceptable to the engineer; sample came from Savannah river.' I find that plaintiff furnished samples,—one sample coarse, sharp sand, known as 'river sand,' which came from up the Savannah river; and another sample of finer sand, which came from the Savannah river along Tybee Island, and known as 'beach sand.' I find that plaintiff, through its president, W. H. Venable, contracted with Captain O. M. Carter, engineer officer in charge, to furnish and use in the work to be done under the contract in suit a combination sand, composed of one-fourth of said sand known as 'river sand,' and of three-fourths of sand known as 'beach sand.' I find that under this contract the plaintiff proceeded with the work about six months commencing under Captain Carter, and continuing same under Captain Gillette, engineer officer in charge, who succeeded Captain Carter in July, 1897, until December, 1897. I find that this combination sand was clean, first-class quality building sand, containing a suitable mixture of fine and coarse, sharp grains, free from dirt, organic matter, and other impurities, and that the sand used in the work was of like quality to the samples, and complied with the conditions of the contract. I find that in December, 1897, Captain Gillette, engineer officer in charge, who had authority, under paragraph 58 of the specifications, ordered the plaintiff to stop using the combination of sand contracted for, and required him to use exclusively the coarse, sharp sand, known as 'river sand,' from up the Savannah river. The change made in the sand was beneficial to the defendant, the river sand making a better cement than the combination sand contracted for. The plaintiff protested against the change of sand, and furnished the same under protest. The river sand was much more expensive than the beach sand, for the reason that it was several miles distant from the work, and the beach sand was near at hand. Plaintiff was put to additional expense and cost in furnishing the river sand as required by Captain Gillette, engineer officer in charge, to complete the contract, over and above what he has been paid for same by the defendant, the sum of $3,935.16. The defendant was benefited by the change of sand to the extent of said sum of money. It was apparent to the engineer officer in charge who ordered the change in sand that such change would result in large additional expense, and extra expense to the plaintiff."

This finding is adopted as stating substantially and fairly the facts as to this part of plaintiff's claim.

The next item which will be considered is that of ventilating pipe, conduit pipe, 20-inch sewer pipe, and flat iron plates for drains. The auditor's finding of the facts on this subject is as follows:

"Cast-Iron Pipe and Plates: I find from the evidence that plaintiff furnished and put in place 10,261.90 pounds of ventilating pipe; also 8,083 pounds of conduit pipe; also 3,752 pounds of twenty-inch pipe; also 11,915 pounds of cast-iron flat plates for drains. I find that these items were not called for in the specifications or in the contract. I further find that the defendant paid for these items 5c. per pound, the same rate that was paid for drain pipes. I find that these items were not even contemplated by the contract, and that they are extra materials, and putting them in place was extra work, for which the plaintiff is entitled to extra compensation. I find that the ventilating pipe was reasonably worth at current rates, over and above the price paid therefor by the defendant, the sum of $951.16. This sum includes $827.10, the actual cost of furnishing and putting said ventilating pipe in place, and $124.00, the fifteen per cent. profit claimed by the plaintiff. The conduit pipe was reasonably worth, at current rates, over and above the price paid therefor by the defendant, the sum of $511.24. This sum includes $444.56, the actual cost of furnishing and putting said conduit pipe in place, and $66.68, the fifteen per cent. profit claimed by the plaintiff. The twenty-inch pipe was reasonably worth, at current rates, over and above the price paid therefor by the defendant, the sum of $345.00. This sum includes $300.00, the actual cost of furnishing and putting said twenty-inch pipe in place, and $45.00, the fifteen per cent. profit claimed by plaintiff. The cast-iron plates were reasonably worth, at current rates, over and above the price paid therefor by the defendant, the sum of $274.04. This sum includes $238.30, the actual cost of furnishing and putting said plates in place, and $35.74, the fifteen per cent. profit claimed by plaintiff. The profit claimed on the items aforesaid constitutes an element in making up and arriving at the reasonable cost and worth of said items at current rates. The amount paid for the drain pipes was not a proper basis upon which to estimate the price of the items aforesaid. This pipe and these plates not being specified in the contract, and the work of putting them in place being exceedingly difficult, I arrive at the difference in the cost by the figures and estimates given by witness Conant, who was examined in behalf of the defendant. Plaintiff furnished the 8,000 pounds of drain pipe, and was paid 5c. per pound therefor, and this pipe is not included in the item aforesaid. These items properly fall under paragraph 58 of the specifications, which said paragraph is as follows: 'If at any time it should become necessary, in the opinion of the engineer officer in charge, to do any work or make any purchase not herein specified, for the proper completion of this contract, the contractor will be required to furnish the same at the current rates existing at the time of said purchases or work, the current rates to be determined by the engineer officer in charge.' I find from the evidence that the engineer officer in charge of the work under this contract did not determine the current rates of the aforesaid items, and that it was necessary for the plaintiff to institute this suit for the purpose of having the same determined by the court."

This finding by the auditor is supported by the evidence, and seems to state correctly the facts. It is in accordance with the testimony of Mr. Conant, one of the witnesses for the defendant, and is adopted by the court to be the facts in reference to this matter.

As to the item of the cottage for testing cement, I find that the evidence shows that the contractor acquiesced in the requirement of the engineer in charge to construct this cottage. There seems to have been an independent memorandum by which it was understood that a cottage to cost $1,000 was to be erected for this purpose, and that the contractors built this house without any real protest or objection to it. It is entirely clear that no such build-

ing was needed in which to test cement, but it is equally clear that the contractors, for reasons which do not appear, acquiesced in Capt. Carter's request to build a rather expensive cottage. The auditor finds the facts to be as follows:

"Cottage: I find that plaintiff was required by the engineer officer in charge of the work to erect on the defendant's reservation a two-story cottage, at a cost of $1,249.00, which was partially used for the purpose of testing cement. I find that it was the duty of the plaintiff to furnish a building suitable for the purpose of testing cement, and I further find that such a building could have been furnished at a cost not to exceed three hundred dollars. I find that the cottage which the plaintiff erected as aforesaid was a permanent improvement, and that under the contract plaintiff had no right to remove said cottage from the defendant's reservation after the completion of its contract. I find that the engineer officer in charge must have known that this cottage was not necessary for the purpose of testing cement to be used in the work under this contract, and he must have known that he was requiring the plaintiff to do work which was more expensive than that necessary to carry out and perform its contract. I find that this cottage was not specified in the contract, and that it cost the plaintiff $949.00 more than such a building as was necessary for the purpose of testing cement should have cost. I find that the plaintiff, through its agent, protested against erecting such a building for the purpose of testing cement, and offered the defendant a proper building for that purpose, which cost less than $300.00. The defendant's reservation was improved by the erection of said cottage, and enhanced in value to the extent of $949.00, no part of which has been paid."

While this statement of facts is in the main correct, all of the evidence taken together shows the fact to be that, while the contractors may have thought the character of the building required beyond reasonable needs, there was really acquiescence on the part of the officers of the construction company in building it as they did.

The next item is that of cut stone. The facts, so far as they can be ascertained from the record, are as follows: The plaintiff having entered into this contract, as stated, on November 30, 1896, that on January 6th thereafter certain drawings were prepared and shown the plaintiff's representatives, from which it appeared that there was to be in the stone jambs and lintels of the doors only one check or "rabbet," as it is called in the evidence, and subsequently the officer in charge required that the stone should have two checks, or be double rabbetted. The plaintiff, at the time the contract was made, agreed to construct the work according to detail drawings to be furnished; and, while it is a fact from the evidence that the first drawing made showed only one check or rabbet in the stone, it is equally true that at the time the contract was made there was no specific agreement as to the detailed manner in which this work should be done. The most that can be said for the plaintiff is that the engineer in charge changed the detailed plans as the work progressed. This he seems to have had authority to do under the contract.

The next item is as to the plaintiff's claim for extra work in constructing doors. The contract provided that doors should be constructed as follows:

"Doors will be fitted to the magazines, passages, and rooms. They will be made, according to detailed plan, of two thicknesses of sound, well-seasoned 1½-inch white pine, 4 inches wide, tongued and grooved, and planed on both sides. The two thicknesses will be fastened together with bronze bolts, and hung with bronze hinges and gudgeons, as shown on detailed plans. Double doors will have top and foot bolts and plates. All doors will be secured with bronze staples and padlocks of approved design. The wood in the doors will be paid for by the foot, board measure, in place. All bronze door fastenings and fittings will be paid for by the pound in place. The price paid for doors will include painting with three coats of paint, of quality and color to be approved by. the engineer officer in charge."

The fact appears to be that the government officers required the construction of the doors in a better manner than the contractors expected. They seem to have required the strips to be laid, in forming the doors, in such manner as to make what is called in the evidence a "mosaic."

Under another provision of the contract it is required that:

"All work will be executed under the direction of the engineer officer in charge, who will prescribe the order and manner of conducting the same in all its parts, and of inspecting and rejecting such material, work, and workmanship as in his judgment do not conform to the drawings that may be furnished from time to time or to these specifications."

It will be seen, therefore, that this work was to be done in conformity to the requirements of the engineer officer in charge. The proof fails to show any such radical departure from what could have been reasonably expected in reference to the construction of the doors in question as justifies a claim for extra compensation. The requirement of the officer in charge seems to have been that the back set of strips in the doors should cover the cracks or joints or any anticipated aperture in the front set of strips. The whole difference relates to the manner of putting the strips together, and, while the method demanded by the engineer officer in charge was more expensive than that expected or desired by the contractors, its only purpose was to get a first-class door.

## Conclusions of Law.

The general question necessary to be determined at the threshold of this case grows out of a provision of the contract relied upon by counsel for the government to this effect:

"If, at any time during the prosecution of the work, it be found advantageous or necessary to make any change or modification in the project, and this change or modification should involve such change in the specifications as to character and quantity, whether of labor or material, as would either increase or diminish the cost of the work, then such change or modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, and giving clearly the quantities and prices of both material and labor thus substituted for those named in the original contract, and before taking effect must be approved by the secretary of war: provided, that no payments shall be made unless such supplemental or modified agreement was signed and approved before the obligation arising from such modification was incurred. No claim whatever shall at any time be made upon the United States by the party or parties of the second part for or on account of any extra work or material performed or furnished, or alleged to have been performed or furnished, under or by virtue

of this contract, and not expressly bargained for and specifically included therein, unless such extra work or material shall have been expressly required in writing by the party of the first part or his successor, the prices and quantities thereof having been first agreed upon by the contracting parties and approved by the chief of engineers."

The precise question raised is, where the officer in charge of work and the contractors differ as to whether the work required is extra work or not, and it becomes necessary for the contractors either to abandon their contract or to proceed and furnish the material and to do the work not required by a fair interpretation of the terms of the contract, if the provisions of the written contract entered into between the parties, just quoted, applies. Stating it differently, can the engineer officer in charge require materials to be furnished, or particular pieces of work to be done, not within the contract, and the result be that, because the officer in charge or his superior officers refuse to recognize the same in writing as extra, the contractors, when they elect to do the work or furnish the material rather than have the whole burden and financial loss of abandoning the contract thrown upon them, be thereby prevented from recovering for such items as extra? It seems well settled now that where the claim is clearly meritorious there may be recovery.

In Grant v. U. S., 5 Ct. Cl. 72, it is held:

"Where a written contract, entered into by the war department, contains full specifications of a building to be erected, and limits the cost, with a provision that no extra charge for modification shall be allowed unless agreed upon in writing, and where an appropriation therefor is made by congress agreeing with the contract price, yet if the contractor is directed by an agent of the war department to furnish extra materials and perform extra labor, so that the building is rendered more valuable and useful, and is thus accepted and used by the government, the defendants become liable, in an action on an implied contract, for the fair and reasonable value of the extra materials furnished, and for the extra labor performed, notwithstanding the cost exceeds the appropriation, and notwithstanding Act 2d June, 1862 (12 Stat. 411), limiting the power of the secretary of war, as well as all officers or agents acting under him, in matters of contract, to written agreements."

In Ford v U. S., 17 Ct. Cl. 60, in the syllabus (3), the ruling is that:

"A provision in a written contract declaring that no claim for extra work shall be made unless it was required and agreed upon in writing is merely a condition, which may be waived by a subsequent oral agreement."

The case of Barlow v. U. S., 35 Ct. Cl. 514, is an interesting case, and particularly applicable here as to the item of sand. A distinction is drawn in that case between the requirement of extra work by a subordinate officer and an officer or agent of the government authorized to contract. The engineer officer in charge in that case had an understanding with the contractors as to the quality of sandstone which would be satisfactory to the government. They incurred expense on the faith of that understanding, and, the sandstone thus agreed upon being subsequently rejected by the chief of the bureau, they were allowed to recover for the damage they had sustained.

In the case at bar it was the engineer officer in charge who made the agreements relied upon for recovery, and it was the engineer

114 F.—49

officer in charge who really made the contract as to its details, the character of the materials, etc. In the Barlow Case it was said:

"Where additional work or better material than the contract requires was ordered by a subordinate officer having no such authority, the compliance of the contractor must be regarded as voluntary service, and no contract can be implied, even though the defendants acquired a benefit by the change; that is to say, the government cannot thus be compelled to build a better building than was intended by its responsible contracting officer. Driscoll's Case, 34 Ct. Cl. 508, and cases cited page 524. Where, on the contrary, the alterations or additions were ordered by an officer clothed with responsibility and authority to contract, a contract will be implied to the extent of the benefit which the defendants have received, and the claimant will recover in quantum meruit. Hawkins v. U. S., 96 U. S. 689, 24 L. Ed. 607. Where a contract expressly provides that alterations or additions must be ordered in writing, and the cost be agreed upon before the work be done, the principals to the contract, in ordinary cases between individuals, may waive the requirement. So, in the case of government contracts, the officer who has authority to order or agree in writing must be considered pro hac vice as the principal; and if he orders a change orally, and the contractor acts on the order and performs the extra work, the parties will be deemed to have mutually waived the requirement. Ford's Case, 17 Ct. Cl. 75."

Capt. Carter first, and afterwards Capt. Gillette, were the officers in charge of the construction of these fortifications. They were not such subordinate officers as would classify extra work ordered by them as mere voluntary work, on account of the subordinate or inferior character of their duties; but, having the control that has been indicated, they could make such alterations in the character of material, and direct it to be used in such way, it seems to me, as would make their actions binding on the government. Certainly this is true as to the two items in respect to which their action is held to have brought about an implied contract by the government to pay in this case. Counsel for the government rely on the case decided some years ago in this court of Bowe v. U. S. (C. C.) 42 Fed. 761, as authority in this case. I do not think there is anything in that case, or in the authorities there cited, inconsistent with what is determined here.

As to the item of sand, the conclusion of law as to this item is that the contract originally was for the use of a mixture of sand composed of material obtained one-fourth from the river above the city of Savannah, and three-fourths from the beach below the city, which contract was acquiesced in by Capt. Carter, the engineer officer in charge at that time, by allowing the use of the same. The subsequent action of Capt. Gillette in requiring all the sand to be obtained from above the city, at a largely additional cost over the mixture indicated, would justify a recovery by the contractors for such additional cost. The evidence is undisputed as to the cost of the sand as required by Capt. Gillette over that contracted for and allowed by Capt. Carter, to wit, $3,933.16, for which amount the plaintiff is entitled to recover.

As to the item of pipe, the finding of the auditor in reference to this claim is, as has been stated, supported by the evidence. The additional cost of furnishing the pipe referred to, and the expense of laying the same, seems to have been in addition to what was

provided for in the contract, and the plaintiff is entitled to recover for the same. The only matter which involves real difficulty is that of the 15 per cent. allowed as profit. As to this, I am of the opinion that it would not be just to allow the contractors only the absolute cost of the pipe and the expense of laying the same, without anything whatever to cover their own compensation and the reimbursement to them for their attention to the work and their fair profit as contractors. All the witnesses agree, I think, that 15 per cent. on the actual outlay is a reasonable amount in this respect. The plaintiff is entitled to recover as to this item the difference as stated by the auditor, to wit, $2,081.44.

As to the item of the cottage for testing cement, I find that, although the plaintiff was required to construct a cottage wholly unnecessary for the purpose intended, yet, as the officers of the construction company appear to have acquiesced in this, they should not be allowed to recover the additional cost over that which would have been necessary for a structure for the proper testing of cement.

As to the item of cut stone, the claim for the special compensation as to this item is for the manner in which the work was required to be done, which was within the control of the engineer officer in charge, under the contract. The plaintiff was not misled in any way before the contract was entered into, and any misapprehension which the officers of the company may have had as to the manner in which the engineer officer in charge would require the stone to be cut occurred after the contract was made. Any hardship to the contractors that may have resulted arose simply from the manner in which the work was required to be done, which was not such as to justify a claim for extra work for which a recovery can be had.

As to the item for doors, the same reasons which have been stated as to the claim for extra work on cut stone apply to the manner in which the doors were required to be constructed, and for the same reason the plaintiff is not entitled to recover as to this item.

The conclusion is that the plaintiff is entitled to recover a judgment for the item of sand in the amount of $3,933.16, and for the item of pipe in the amount of $2,081.44, making the aggregate sum of $6,014.60, for which they should have judgment, with interest.